352 F.2d 494
 John S. WARREN, as Special Administrator of the Estate of James D. Bowen, Deceased, Appellant,
v.
The FLYING TIGER LINE, INC., a corporation, Appellee.
Klara GLYNN, Administratrix of the Estate of Walter Glynn, Appellant,
v.
The FLYING TIGER LINE, INC., a corporation, Lockheed Aircraft Corporation, Appellees.
Sue PRATHER, Administratrix of the Estate of Douglas Arnold Haaf, Appellant,
v.
The FLYING TIGER LINE, INC., a corporation, Appellee.
Thelma Jean KISSEE, Administratrix of the Estate of Charles Edward Kissee, Deceased, Appellant,
v.
The FLYING TIGER LINE, INC., a corporation, Appellee.
Joyce GLASSMAN, Administratrix of the Estate of Robert Glassman, Deceased, and Joyce Glassman, an individual, Appellants,
v.
The FLYING TIGER LINE, INC., a corporation, Appellee.
Floyd A. DEMANES, Administrator of the Estate of Hubert L. Rice, Deceased, et al., Appellants,
v.
The FLYING TIGER LINE, INC., a corporation, et al., Appellees.
 Nos. 19572-19575.
 No. 19587.
 Nos. 19588-19592.
 Nos. 19594-19596.
 Nos. 19598-19600.
 No. 19603.
 No. 19604.
 No. 19606.
 No. 19608.
 United States Court of Appeals Ninth Circuit.
 October 25, 1965.
 
 Stanley I. Arenberg, Jerome L. Goldberg, Herman F. Selvin, Loeb & Loeb, Los Angeles, Cal., for appellant John S. Warren.
 Robert D. Cloud, Mathews & Cloud, Rialto, Cal., for appellant Klara Glynn.
 Daniel C. Cathcart and Ellis J. Horvitz, Magana, Olney, Levy, Cathcart & Gelfand, Los Angeles, Cal., for appellant Sue Prather.
 Charles Zeller, Stockton, Cal., Jerome L. Goldberg, Los Angeles, Cal., for appellant Thelma Jean Kissee.
 William J. Scammon, San Mateo, Cal., for appellant Joyce Glassman, Administratrix, etc.
 Floyd A. Demanes, San Bruno, Cal., for appellants Floyd A. Demanes, Administrator of Estate of Rice, et al.
 Robert C. Packard, Kirtland & Packard, Los Angeles, Cal., for appellee Flying Tiger Line, Inc.
 John W. Douglas, Asst. Atty. Gen., Morton Hollander, Richard S. Salzman, Attys., Dept. of Justice, Washington, D. C.
 Before BARNES, HAMLEY and KOELSCH, Circuit Judges.
 HAMLEY, Circuit Judge:
 
 
 1
 The multiple appeals dealt with in this opinion arise from individual libels against The Flying Tiger Line, Inc. (Flying Tiger), and others, seeking damages under the Death on the High Seas Act, 41 Stat. 537 (1920), 46 U.S.C. §§ 761-768 (1964).
 
 
 2
 In March, 1962, an aircraft owned and operated by Flying Tiger, disappeared en route from Travis Air Force Base, California to Vietnam. The plane was under charter to the United States Air Force and was carrying, in addition to its crew, ninety-six passengers, ninety-two of whom were United States soldiers. Libellants are the personal representatives of the soldier passengers. They seek recovery, on behalf of dependents, for the wrongful death of the deceased servicemen.
 
 
 3
 An issue common to all cases is whether the so-called Warsaw Convention[1] (Convention), 49 Stat. 3000 (1934), applies to limit Flying Tiger's liability to $8,300 for each person killed. Four cases were consolidated for trial of this issue,[2] and the parties in the remaining cases stipulated to be bound by the ultimate decision on the question.
 
 
 4
 After the trial of the stated issue the district court entered a judgment determining that the Convention is applicable under the facts as found. The accompanying opinion of the district court is reported in 234 F.Supp. 223. Libelants then took these interlocutory appeals pursuant to 28 U.S.C. § 1292(b) (1964).
 
 
 5
 Article 22(1) of the Convention provides that in the international transportation of passengers the liability of the carrier for each passenger shall be limited to the sum of 125,000 French francs, or approximately $8,300. Article 3(1) provides that for the international transportation of passengers the carrier "must" deliver a passenger ticket. Article 3(2) provides that if the carrier accepts a passenger without a passenger ticket having been delivered he shall not be entitled to avail himself of those provisions of the Convention which exclude or limit his liability. The information to be contained in the passenger ticket is prescribed in Article 3(1) (a)-(e). Article 3 of the Convention is quoted in the margin.[3]
 
 
 6
 Appellants contend that, assuming the Convention to be otherwise applicable under the facts of this case, Flying Tiger is not entitled to the limitation of liability afforded by Article 22(1) of the Convention, because it accepted the passengers in question without delivering tickets to them in the manner required by Article 3. Appellants argue, specifically, that assuming that the boarding tickets, which were handed to each passenger at the foot of the ramp leading to the plane, complied with Article 3 as to contents and form, the handing of the tickets to the passengers at that time came too late to be regarded as a delivery of passenger tickets within the meaning of that Article.
 
 
 7
 The facts essential to a consideration of this argument are not in dispute. In September, 1961, Flying Tiger entered into what was denominated a "Call Contract" with the United States Military Air Transport Service (MATS), wherein Flying Tiger agreed to provide air transportation for Government personnel in aircraft owned and operated by the carrier. This call contract sets forth the general terms and conditions under which the transportation would be undertaken, and describes the standards to which Flying Tiger was required to conform. Actual performance under the call contract, however, would only commence when the United States issued a service order to Flying Tiger for a specific flight assignment.
 
 
 8
 On March 2, 1962, MATS issued a service order requesting Flying Tiger to provide air transportation for ninety-nine persons from Travis Air Force Base in California to Tan Son Nhut Air Base in Saigon, Vietnam. Pursuant to the call contract and this service order, Flying Tiger supplied a Lockheed Constellation aircraft and all the required operating personnel at Travis Air Force Base on March 14, 1962. Travis Air Force Base is a United States military installation under the exclusive control of Government personnel.
 
 
 9
 The passengers on this flight were selected exclusively by MATS. On the morning in question each serviceman so selected appeared at the MATS window at Travis Air Force Base and displayed his orders. Each was given a MATS boarding pass and a MATS claim check. The servicemen then went to the boarding gate where they were checked through by military personnel.
 
 
 10
 The passengers then proceeded to the ramp leading to the plane, where they had their first contact with Flying Tiger. That company had not been given a passenger manifest listing the names of passengers until shortly before the craft was loaded. At the foot of the ramp a Flying Tiger stewardess gave to each passenger what was denominated a "Boarding Ticket." The stewardesses were given written instructions by Flying Tiger not to allow any passenger to board the plane without a boarding ticket. The stewardesses did not take the passengers' names or otherwise engage them in conversation concerning the flight. The passengers then entered the plane and made their own choice of seats.
 
 
 11
 Shortly after the passengers boarded and took their seats, a stewardess appeared in the cabin and went through the usual demonstration of emergency procedures. At the same time the stewardess told the passengers that they should write their boarding ticket numbers on their claim checks. The passengers were not thereafter required to make any use of their boarding tickets. Max Oldford, the station manager for Flying Tiger at Travis, prepared the boarding tickets on a duplicating machine, making about ten per cent more than the anticipated number of passengers as estimated by MATS.
 
 
 12
 The boarding passes issued by MATS when the passengers presented themselves at the MATS counter contained no reference to the Warsaw Convention, or to any limitation on the liability of Flying Tiger. On the front of the boarding tickets passed out by the Flying Tiger stewardess at the foot of the ramp, however, it was stated that the transportation was "* * * subject to the rules relating to liability established by the Convention * * * if such transportation is `international transportation' as defined by said Convention." There were also conditions referring to the Convention printed on the back of the boarding tickets. However, as the trial court found, it would be difficult for one to read the fine print on the back of these tickets without a magnifying glass.
 
 
 13
 The boarding tickets did not contain the names of the passengers to whom they were issued, nor did they set forth the "agreed" stopping places en route to destination. Flight insurance was available in the Travis Air Force Base terminal, and also in the terminal at Honolulu, where the plane made a three-hour stop. After receiving boarding tickets at the foot of the ramp at Travis, however, the servicemen were required to board the plane immediately and no opportunity was afforded them to read the boarding ticket at that time and to return to the terminal to purchase insurance.
 
 
 14
 The flight departed Travis Air Force Base at approximately 5:45 a. m. on March 14, 1962. After intermediate stops at Honolulu and Wake Island, it reached Guam on March 15, 1962. Later that day it departed for Clark Air Force Base in Manila, P.I. The plane never reached that destination and has not been seen or heard from since.
 
 
 15
 Article (3) of the Convention, quoted in note 3, provides that if the carrier "accepts a passenger without a passenger ticket having been delivered," it shall not be entitled to the limitation of liability afforded by Article 22(1). This provision, considered alone, could perhaps be construed as entitling a carrier to preserve its limitation of liability by delivering the passenger ticket at any time before the passenger boards the plane, or even thereafter and prior to takeoff.
 
 
 16
 But the provision in question does not stand alone. It is part of an Article of the Convention in which the particulars to be contained in the passenger ticket are spelled out in detail. One of these particulars, contained in Article 3(1) (e) is the inclusion of a statement "* * * that the transportation is subject to the rules relating to liability established by this convention." The purpose of such a statement is to notify passengers of the applicability of the Convention, thus affording them an opportunity to take steps to protect against the limitation of liability. The most common self-protective measure is, of course, the procurement of additional flight insurance. See Mertens v. Flying Tiger Line, Inc., 2 Cir., 341 F.2d 851, 857.
 
 
 17
 Having in view this purpose in providing a passenger ticket, we are of the opinion that it is an implied requirement of Article 3(2), that delivery of the passenger ticket be made sufficiently in advance of the flight so that the passenger may, if he desires, obtain additional insurance protection. In this we are in complete accord with Mertens v. Flying Tiger Line, Inc., supra, at 856.
 
 
 18
 In Mertens, the passenger ticket was delivered to the passenger only after he had boarded the plane; material which the passenger was accompanying under military orders was already loaded on the plane. At the time of delivery, the aircraft was parked on the ramp about ready to take off. Plaintiffs contended that, under the circumstances, there had not been a delivery of a passenger ticket within the meaning of Article 3.
 
 
 19
 The issue was submitted to the jury, which found that the ticket had been delivered. Accordingly, the judgment entered by the district court while in favor of plaintiffs, limited liability to $8,300. The court of appeals reversed, holding that, as a matter of law, on the undisputed evidence summarized above, the delivery of the ticket was not adequate and that the limitation on damages of the Convention was therefore inapplicable. The court said, in part:
 
 
 20
 "The delivery requirement of Article 3(2) would make little sense if it could be satisfied by delivering the ticket to the passenger when the aircraft was several thousand feet in the air. The specific language of Article 3(2), making the limitation on liability unavailable `if the carrier accepts a passenger without a passenger ticket having been delivered,' lends substantial support to our position." 341 F.2d at 857. (Emphasis in original.)
 
 
 21
 Under the facts of the case before us, the passenger tickets were delivered at the foot of the ramp just as the servicemen boarded the plane. None of the passengers were afforded a reasonable opportunity of even reading the ticket, much less obtaining additional insurance, before they were accepted by boarding the plane. The passengers were thereby deprived of a right which was intended to be afforded them as a concomitant to the carrier's right to limit its liability.
 
 
 22
 Nor were these passengers in any way responsible for this loss of right, as might be the case where a passenger arrives too late to read his ticket before boarding, or accepts standby status which requires him to board on short notice. The passengers who boarded this flight were in the terminal building at Travis, where flight insurance could have been purchased, for a considerable period of time before they were ushered out through the boarding gate. Had they been issued passenger tickets in the terminal, carrying notice of the Warsaw Convention limitation of liability, they would have had ample time to obtain additional insurance.
 
 
 23
 We regard as immaterial the fact that the passengers could have purchased additional flight insurance at Honolulu. They had already been accepted as passengers without an adequate delivery of tickets having been made. Before boarding the plane at Travis they were entitled to adequate notice which would have enabled them to purchase additional insurance covering the entire flight.
 
 
 24
 In view of our determination on this issue, it is unnecessary to consider the several other reasons advanced by appellants why the order should be set aside.
 
 
 25
 Reversed and remanded for further proceedings consistent with this opinion.
 
 
 
 Notes:
 
 
 [1]
 The official title is "CONVENTION FOR THE UNIFICATION OF CERTAIN RULES RELATING TO INTERNATIONAL TRANSPORTATION BY AIR." 49 Stat. 3014. Adherence to it by the United States with one reservation, the Senate advising and consenting [78 Cong. Rec. 11582 (1934)], was proclaimed by the President on October 29, 1934. [49 Stat. 3013] The reservation was that paragraph (1) of Article 2 (which made the Convention applicable "to transportation performed by the state or by legal entities constituted under public law" [49 Stat. 3015]), should not apply "to international transportation that may be performed by the United States." [78 Cong. Rec. 11582 (1934)]
 
 
 [2]
 John S. Warren v. The Flying Tiger Line, Inc., No. 19572; Klara Glynn v. The Flying Tiger Line, Inc., No. 19573; Sue Prather v. The Flying Tiger Line, Inc., No. 19574; and Thelma Jean Kissee v. The Flying Tiger Line, Inc., No. 19575
 
 
 [3]
 
 "Article 3:
 "(1) For the transportation of passengers the carrier must deliver a passenger ticket which shall contain the following particulars:
 "(a) The place and date of issue;
 "(b) The place of departure and destination;
 "(c) The agreed stopping places, provided that the carrier may reserve the right to alter the stopping places in case of necessity, and that if he exercises that right, the alteration shall not have the effect of depriving the transportation of its international character;
 "(d) The name and address of the carrier or carriers;
 "(e) A statement that the transportation is subject to the rules relating to liability established by this convention.
 "(2) The absence, irregularity, or loss of the passenger ticket shall not affect the existence or the validity of the contract of transportation, which shall none the less be subject to the rules of this convention. Nevertheless, if the carrier accepts a passenger without a passenger ticket having been delivered he shall not be entitled to avail himself of those provisions of this convention which exclude or limit his liability."