**In re KOREAN AIR LINES DISASTER OF SEPTEMBER 1, 1983**

MDL No. 565.

Misc. No. 83–0345.

Civ. A. Nos. 83–2793, 83–2941, 83–3154, 83–3177, 83–3204, 83–3441, 83–3445, 83–3448 to 83–3470, 83–3473, 83–3474, 83–3587, 83–3588, 83–3792, 83–3793, 83–3889, 83–3891, 83–3898, 83–3901 to 83–3903, 84–0029, 84–0030 and 84–0402.

United States District Court,
District of Columbia.

July 25, 1985.

See also, 597 F.Supp. 621.

## MEMORANDUM AND ORDER

AUBREY E. ROBINSON, Jr., Chief Judge.

### INTRODUCTION

Before the Court is a motion for summary judgment on the sole issue of the enforceability of the limitation on damages established by the Warsaw Convention (Convention)[1] and asserted by Defendant Korean Air Lines Co., Ltd. (Korean Air Lines) in the above-captioned multidistrict litigation. These Plaintiffs argue that, as a matter of law, Korean Air Lines is liable to them to the full extent of their damages for having delivered defective tickets to their decedents, passengers killed when a commercial airliner (KAL 007) owned and operated by Defendant was tragically destroyed by Soviet military aircraft over the Sea of Japan.

The material facts are undisputed. Defendant delivered tickets to Plaintiffs' decedents before their "international transportation" began. The tickets contained notice of the applicability of the Warsaw Convention's rules limiting Korean Air Lines' liability. The notice was printed in 8.0 type size. Since the passenger tickets at issue included a point of origin, destination or stopping place within the United States, the provisions of the Montreal Intercarrier Agreement, (Montreal Agreement),[2] are also relevant. The question before the Court is whether the failure to print notice to passengers of the applicability of the Warsaw Convention in 10-point modern type size, as required by the Montreal Agreement, strips the carrier of the Convention's liability limitation. Having considered the treaty, its history and development, and all evidence presented the Court concludes that the carrier cannot be prevented from availing itself of the limitation; Plaintiffs' motion shall be denied.

### HISTORY OF THE WARSAW CONVENTION

Before considering this motion, it is necessary to clearly understand the Warsaw Convention. It is a multilateral treaty intended to uniformly regulate international airline transportation. Today, more than 120 nations adhere to the rules contained in the Convention. Originally negotiated at two international conferences, the first in Paris in 1925 and the second in Warsaw in 1929, the Convention had a dual purpose. In recognition of the fact that the newly emerging air industry would link many na-

1. Convention for the Unification of Certain Rules Relating to International Transportation by Air, October 12, 1929, 49 Stat. 3000, T.S. No. 876, 137 L.N.T.S. 11, *reprinted in* 49 U.S.C. § 1502 note (1976).

2. Agreement relating to Liability Limitations of the Warsaw Convention and the Hague Protocol, Agreement CAB 18900 (Exhibit 1 to Affidavit of Milton G. Sincoff, sworn to February 15, 1984), approved by CAB Order E–23680, May 13, 1966 Docket 17325), 31 Fed.Reg. 7302 (1966).

tions of divergent systems and laws, the first goal was to establish some degree of uniformity as to documentation for tickets and the like and as to the procedure and substantive rules of law which would govern claims arising out of international transportation by air. Lowenfield and Mendelsohn, *The United States and the Warsaw Convention*, 80 Harv.L.Rev. 497, 498–499 (1967) (hereinafter referred to as Lowenfeld & Mendelsohn). In order to help the then fledgling air industry to attract needed capital, the second goal was to limit the potential liability of the air carriers in the case of accidents. Clearly recognized as the more important goal of the Convention, in Article 22(1), the limitation on liability was set at 125,000 Poincare francs, or approximately 8,300 United States dollars.[3] In exchange, for the limitation, the Warsaw Convention, in Article 20, created a rebuttable presumption of air carrier liability unless "he proves that he and his agents have taken all necessary measures to avoid the damage or that it was impossible for him or them to take such measures." Article 25 then provided that, in cases where a plaintiff is able to prove "willful misconduct" the carrier will not be entitled to avail himself of the limitation on liability.

On July 31, 1934, the United States deposited its instrument of adherence to the Warsaw Convention in the archives of the Ministry of Foreign Affairs of Poland in accordance with the procedure set forth in Article 37 of the treaty. At the time the Senate ratified the treaty, notably during the time this country (and the world) was in the midst of the Great Depression, the $8,300 amount of the limitation was thought to provide some benefit to both passengers and carriers. Indeed, Secretary of State Cordell Hull transmitted the Warsaw Convention to the Senate with the following statements:

It is believed that the principle of limitation will not only be beneficial to passengers and shippers as affording a more definite basis of recovery and as tending to lessen litigation, but that it will prove to be an aid in the development of international air transportation, as such limitation will afford the carrier a more definite and equitable basis on which to obtain insurance rates, with the probable result that there would eventually be a reduction of operating expenses for the carrier and advantages to travelers and shippers in the way of reduced transportation charges.

Senate Comm. on Foreign Relations, *Message from the President of the United States Transmitting a Convention for the Unification of Certain Rules*, Sen. Exec. Doc. No. G, 73d Cong., 2d Sess. 3–4 (1934). Therefore, at the time of ratification, the principle and amount of limitation were assented to by the United States. Since that time and especially with the growth of the air industry to its present proportions, the limitation has become an increasingly uncomfortable and unpopular proposition.

While the limitation was once accepted, it has constantly been the focus of debate and disagreement. The United States, although adhering to the uniform rules relating to international transportation, has not been satisfied with the low limits placed on air carrier liability. As early as 1935, one year following United States adherence, there was discussion of possible amendment to the Convention. Lowenfeld & Mendelsohn at 502. As a result of the alarm expressed by the United States and other nations where full recovery for personal injury and wrongful death had become the rule, discussions and proposals for change continued until another conference met in September 1955. Convened this time at the Hague, the stated goal was to resolve the debate concerning whether the liability limits had been set at an appropriate level. Lowenfeld & Mendelsohn at 504. The Hague Conference, therefore, had a limited purpose with the intent being

---

**3.** The actual amount was $8,291.87. *Block v. Compagnie Nationale Air France*, 386 F.2d 323, 325 (5th Cir.1967). Article 22(4) of the Convention provides that "The sums mentioned above shall be deemed to refer to the French franc consisting of 65 milligrams of gold at the standard of fineness of nine hundred thousandths. The sums may be converted into any national currency in round figures.

to retain uniformity in the rules and conditions expressed in the Warsaw Convention while resolving the dissatisfaction with the low limits of liability. S. Speiser & C. Krause, 1 *Aviation Tort Law*, § 11:18 (1978).

Through much negotiation and debate the Hague Protocol did, among other things, double the limitation to $16,600. Nonetheless, the outcome of the Hague conference failed to resolve the dissatisfaction; the United States never ratified the Hague Protocol. In fact, the amendments to Warsaw were never presented to the Senate for ratification, since even the increased limitation faced an unpleasant political climate. Lowenfeld & Mendelsohn at 515. The limitation amount therefore remained at $8,300 in this country.

Discontent continued for another decade. Then, in 1965, the United States determined that the Warsaw limitation could no longer be tolerated and decided to denounce the treaty. Deposited November 15, 1965 and in accordance with Article 39, set to become effective six (6) months later, the Notice of Denunciation stated that "the United States wishes to make clear that the action to denounce the Warsaw Convention is taken *solely* because of the Convention's low limits of liability for injury or death to passengers, and in no way represents a departure from the long-standing commitment of the United States to the tradition of international cooperation in matters relating to civil aviation." (emphasis added). The Notice continued to state clearly that the threat of denunciation would be withdrawn if the limitation were raised, by special contract or otherwise, to preferably $100,000 but not less than $75,000.

The Montreal Agreement was adopted in response to the United States' decision to withdraw from the Warsaw Convention. Unlike the Hague Protocol, the Montreal Agreement did manage to calm the din of criticism of the low limits which had, by 1965, "reached a crescendo." Speiser & Krause at 674. In order to avert United States denunciation of the treaty, air carriers agreed to raise the limitation amount to $75,000 and to submit to virtual strict liability; the Montreal Agreement provides that an air carrier "shall not ... avail itself of any defense under Article 20(1) of said Convention or said Convention as amended by [Hague] Protocol." In addition, the Agreement provided that the "Montreal Advice" would be printed in 10-point modern type and in ink contrasting with the ticket stock. However, The Montreal Agreement is completely silent with respect to sanctions to be imposed for failure to comply with any of its three provisions.

Absolutely nothing is said to indicate that waiver of the limitation was contemplated, the Montreal Agreement was entered into to *preserve* the limitation. Intended only as an interim agreement until the treaty could be amended, the Montreal Agreement achieved a stand-off on the issue of the level of the limitation. By its very terms, the Agreement is only a "special contract" under the Warsaw Convention. It applies to "international transportation" as defined in Article 1(2) which includes a point in the United States as a point of origin, point of destination, or agreed stopping place. While leaving air carriers liable without fault, the Agreement permits air carriers to avail themselves of the liability limitation found in Article 22(1); however, the amount of the limitation is increased to $75,000 and the defenses found in Article 20(1) have been waived.

Although the increase from $8,300 to $75,000 was significant, the fact remains that the United States will probably never be satisfied with any amount as a limit upon recovery. Therefore, while the debate has been phrased in terms of the "appropriate" level of the limitation, *see, e.g.,* Lowenfeld & Mendelsohn at 504, it is the very idea of any limit at all which has been and remains the problem. The United States has consistently rejected all limitation amounts; it certainly appears that "no convention with a limitation of damages can possibly pass the Senate of the United States." L. Kreindler, *A Plaintiff's View of Montreal*, 33 Air L. & Com. 528 (1967).

## ISSUES PRESENTED

At issue is the interpretation of Article 3 of the Warsaw Convention which provides:

(1) For the transportation of passengers the carriers must deliver a passenger ticket which shall contain the following particulars:

(a) The place and date of issue;

(b) The place of departure and of destination;

(c) The agreed stopping places, provided that the carrier may reserve the right to alter the stopping places in case of necessity, and that if he exercises that right, the alteration shall not have the effect of depriving the transportation of its international character.

(d) The name and address of the carrier or carriers;

(e) A statement that the transportation is subject to the rules relating to liability established by this convention.

(2) The absence, irregularity, or loss of the passenger ticket shall not affect the existence or the validity of the contract of transportation, which shall none the less be subject to the rules of this convention. *Nevertheless, if the carrier accepts a passenger without a passenger ticket having been delivered he shall not be entitled to avail himself of those provisions of this convention which exclude or limit his liability.*

(emphasis added).

Originally, Plaintiffs based their motion on a claim that the Montreal Agreement modified these provisions of the Convention so as to require air carriers to deliver to passengers embarking on "international transportation" tickets containing notice of the applicability of the Warsaw Convention in at least 10–point type size in order to limit their liability. It is Plaintiffs' position that the Montreal Agreement also "modified" the treaty provisions relating to the amount of the limitation, raising it from $8,300 to $75,000. Further, Plaintiffs' argue that a carrier's failure to print the Montreal Advice in at least 10–point type constitutes "nondelivery" of a ticket under Article 3(2) and therefore triggers the treaty sanction—forfeiture of the limitation for air carrier liability.

In a subsequent pleading, Plaintiffs changed the focus of their argument from a claim that the Convention was modified in Montreal to a claim that the Warsaw Convention is not applicable at all because "Korean Air Lines, a corporate citizen of a nation not a party to the Warsaw Convention, has no standing to avail itself of the defenses contained in the Warsaw Convention." Plaintiffs' Reply Brief at 3. This argument is based on the notion that there is no treaty relationship between the Republic of Korea and the United States and that, therefore, the Convention cannot apply to an air carrier incorporated in Korea. Plaintiffs contend that the absence of a treaty relationship with Korea, if indeed there is no such relationship, prevents Korean Air Lines from asserting the Warsaw Convention limitation on liability. However, if Plaintiffs are correct and the applicability of the Convention rests on the existence of reciprocal ratification by Korea and there has been no such ratification, then, not only would Korean Air Lines be precluded from claiming the limitation, the Court would be altogether precluded from exercising jurisdiction over the air carrier.

Korean Air Lines vigorously opposes the motion for partial summary judgment. Under either of the somewhat contradictory theories posited by Plaintiffs, Defendant claims that the Montreal Agreement, being an agreement between air carriers, not nations, cannot modify the Warsaw Convention to require or trigger the imposition of the treaty sanction of unlimited liability. Further, Korean Air Lines argues that the United States and the Republic of Korea do maintain a treaty relationship with respect to the Convention; consequently, Plaintiffs' second theory cannot be correct.

By challenging Korean Air Lines statement that "the rights of the moving plaintiffs and defendant KAL are governed exclusively by the provisions of a treaty of the United States known as the Warsaw Convention," Plaintiffs' second theory impugns the jurisdiction of the Court. The

challenge to "treaty jurisdiction" affects not only the actions filed by these Plaintiffs, but this entire multidistrict litigation. Therefore, the question concerning jurisdiction and the requirement of a treaty relationship with Korea must be examined before proceeding to the issue of the applicability of the Warsaw Convention limitation on liability.

## JURISDICTION UNDER THE WARSAW CONVENTION

Article 1(1) provides that "[t]his Convention shall apply to all international transportation of persons, baggage or goods performed by aircraft for hire." Article 17 of the Convention makes the carrier liable for the death or personal injury of passengers sustained while engaged in international transportation. Article 24 of the Convention further states that cases brought for damages sustained in the event of wounding of passengers "can only be brought subject to the conditions and limits set out in this convention"; Article 32 emphasizes this point by stating that the parties are prevented from "deciding the law to be applied" or "altering the rules as to jurisdiction." Therefore, nations which are parties to the Warsaw Convention have agreed that actions for wrongful death or personal injury occurring during "international transportation" will be governed by the rules of the Convention.

■ As a treaty of the United States and, therefore, the "supreme law of the Land," U.S. Const. art. VI, the Warsaw Convention preempts other laws. Since the Warsaw Convention applies to "international transportation" and since the United States has agreed to this treaty, as "supreme Law of the Land" the Convention exclusively and specifically controls the recovery which plaintiffs seeking damages for wrongful death or personal injury occurring during "international transportation" may receive in American courts. *In re Air Crash Disaster at Warsaw, Poland on March 14, 1980*, 535 F.Supp. 833, 844–845 (E.D.N.Y.1982), aff'd. 705 F.2d 85 (2d Cir.1983), *cert. denied*, 464 U.S. 845, 104 S.Ct. 147, 78 L.Ed.2d 138 (1984). The Convention also governs the question of juris-

diction; therefore, the Court must look to the terms of the Convention to determine its applicability.

By its terms, the Warsaw Convention applies only to "international transportation," defined in Article 1(2) as:

any transportation in which, according to the contract made by the parties, the place of departure and the place of destination, whether or not there be a break in the transportation or transshipment, are situated either within the territories of two High Contracting Parties, or within the territory of a single High Contracting Party, if there is an agreed stopping place within a territory subject to the sovereignty, suzerainty, mandate or authority of another power, even though that power is not a party to this convention.

■ The four conditions specified in Article 28(1), *i.e.*, domicile of the carrier, principal place of business, place where the ticket was purchased or the place of destination, are generally thought to control jurisdiction once "international transportation" has been established. *See e.g., Vergara v. Aeroflot "Soviet Airlines"*, 390 F.Supp. 1266, 1269 (D.Neb.1975; *Smith v. Canadian Pacific Airways, Ltd.* 452 F.2d 798 (2d Cir.1971); *Benjamins v. British European Airways*, 572 F.2d 913 (2d Cir. 1978), *cert. denied.* 439 U.S. 1114, 99 S.Ct. 1016, 59 L.Ed.2d 72 (1979). There being no genuine issue respecting either Article 1(2) or Article 28(1) for the tickets relevant to this motion there should be no question that the Warsaw Convention applies to these actions and that there is treaty jurisdiction in this Court. However, Plaintiffs raise the question of jurisdiction by contending that there is no treaty relationship between Korea and the United States as regards the Warsaw Convention and that the absence of a treaty relationship prevents the Court from exercising any of the Convention's provisions in favor of Defendant, Korean Air Lines, a corporate citizen of Korea. Instead, Plaintiffs would have the Court "enforce" the Montreal Agreement, as though it were a separate con-

tract, without regard to the Warsaw Convention.

■ Plaintiffs argument assumes "treaty jurisdiction" is not necessary to maintain these actions. That is incorrect. "If treaty jurisdiction does not lie, federal jurisdiction under the Convention does not lie, federal jurisdiction under 28 U.S.C. § 1331(a), which permits cases *arising under* United States treaties, clearly cannot be established." *Smith v. Canadian Pacific Airways, Ltd.*, 452 F.2d 798 (2d Cir. 1971) (emphasis in original), *accord, In re Air Crash in Bali, Indonesia on April 22, 1974*, 684 F.2d 1301 (9th Cir.1982). If Plaintiffs are correct, and there is no treaty jurisdiction because there is no treaty relationship, then there is no federal jurisdiction over this Defendant at all.

■ The Court rejects Plaintiffs' contention that there is no treaty relationship between the United States and Korea. Central to Plaintiffs' argument is the fact that the Republic of Korea adheres to the Protocol Amending the 1929 Convention for the Unification of Certain Rules Relating to International Carriage by Air (Hague Protocol), 478 U.N.T.S. 371 (1955), rather than to the Warsaw Convention. By distinguishing the Protocol from the Convention as though the two are independent treaties and by arguing that there is no treaty relationship between this nation and Korea, Plaintiffs ignore the development of the Warsaw system. Having considered the history of the Hague Protocol, the Court concludes that the Protocol cannot be considered separately from the Warsaw Convention; it consists of nothing more than a list of amendments to the original treaty. Indeed, the only difference between the titles of the Convention and the Protocol are the very words "Protocol to Amend." The very name of the Hague Protocol gives evidence that it was intended and, in fact, is merely the Warsaw Convention with certain alterations.

Knowing the history of the conference which produced the Hague Protocol and the reasons the United States negotiated and signed but never ratified the Hague Protocol provides a context for understanding the relationship of the United States to those countries which choose to adopt those amendments. First, since the Protocol came later than the Convention it essentially offered new nations a choice: adopt the Warsaw Convention as originally formulated in 1929 or adopt the amended version as formulated in 1955. The purpose of the Warsaw Convention was to unify the rules; the purpose of the Hague Protocol was merely to amend those same rules. Korea has chosen to adhere to the Hague Protocol and is therefore a High Contracting Party to the Warsaw Convention *through* those amendments. In fact, Article XXIII of the Hague Protocol states that:

> Adherence to this Protocol by any State which is not a Party to the Convention shall have the effect of adherence to the Convention as amended by this Protocol.

Therefore, since July 13, 1967, Korea has adhered to the Warsaw Convention through its ratification of the Hague Protocol. At least with respect to the unamended portions of the Convention, the United States and Korea are parties to the same treaty.

Moreover, it would hardly encourage the goal of the Warsaw Convention to establish uniform rules, law and procedure for claims arising out of international aviation and then to complicate the application of those rules by requiring reciprocity in ratification. The delegates to the Hague Conference were well aware of this and deliberately adopted the negotiated amendments merely as a Protocol to amend Warsaw rather than as an entirely new convention specifically to retain uniformity. Speiser & Krause at 672. Plaintiffs' argument fails because "[t]he Convention is not concerned with reciprocal treatment of nationals; its purpose is to unify rules relating to international transportation by air." 1 *Aviation Tort Law* § 11:15.

The negotiations and events which led to the Montreal Agreement were themselves tied to the convention. Plaintiffs' argument that the Montreal Agreement may be considered without resort to the entire Warsaw system of recovery is untenable.

### INTERPRETING THE WARSAW/MONTREAL LIMITATION OF LIABILITY

On the issue of maximum liability limits, there has been considerable debate and clash of ideology. Yet more than five decades of discussion have managed to produce no more than an uneasy truce on the issue. The level of the limitation has been tinkered with in hopes of making it more palatable. The United States has been able to force some concessions, principally in the nature of a "special contract"—the Montreal Intercarrier Agreement—increasing the limit for wounding, injury or death occurring during the international transportation of passengers involving a point of origin, point of destination or agreed stopping place in the United States; however, the United States remains unhappy with the concept of a limitation on damages.

While the increase from $8,300 to $75,000 brought about by the Montreal Agreement is certainly significant, evidence of continuing American dissatisfaction with *any* limit is found in the fact that the United States Senate has ratified no Convention, Protocol or Agreement since joining the original Convention. This is true even though the United States has been presented with at least three opportunities to join in treaty amendments to raise the limitation. First, there was the Hague Protocol, and then the proposed Guatamala Protocol.[4] The Guatamala Protocol is drafted so as not to become effective without United States ratification. Although these amendments would have raised the limitation to $100,000, the United States Senate failed to ratify by the required two-thirds margin. The most recent amendments proposed to the Convention were drafted in Montreal. These amendments, known collectively as the Montreal Protocols,[5] would have provided for a maximum recovery of approximately $105,000; still the Senate failed to ratify. *See* 129 Cong. Rec. S2237 (daily ed. March 7, 1983); 129 Cong.Rec. S2279 (daily ed. March 8, 1983). Having rejected all proposals to date, it certainly seems that the United States is determined to accept no convention which imposes a limitation on the recovery available to citizens of this country. Therefore, while the debate has been couched in terms of the appropriate level of the limitation, it is the presence of a limitation at all that has been the real concern.

#### A. *Criticisms of the Treaty Limitation*

There have been two principle criticisms of the Convention's limitations. First, the limitations have been objected to on the ground that the reason for limiting liability in 1929 no longer exists today. In 1929, the limitation was adopted in order to promote a fledgling industry. "The international air giants of today were literally in their swaddling clothes." L. Kriendler, 1 *Aviation Accident Law* § 11:01[5] (1963). Then, the air industry was struggling to become truly international. Capital had yet to be invested and needed encouragement. It was hoped that the limitation on damages would attract capital and allow carriers to obtain insurance that might otherwise be discouraged by the threat of a single catastrophic accident. Lowenfeld & Mendelsohn at 499.

Today, however, the world of aviation is vastly different. In the fifty years since the Convention, air carriers have obtained both the necessary capital and insurance to allow the industry to grow to tremendous proportions. It is now the air industry, not individual members of society, which is best able to bear the burden of loss in cases of catastrophic accidents. Society, having accepted the burden of low recoveries during the industry's infancy, now feels that the risk of loss is better placed on what have grown to be major, mature corporations, often operating as world enterprises, instead of the individual victims.

---

**4.** Protocol to Amend the Convention for the Unification of Certain Rules Relating to International Carriage by Air, ICAO Doc. No. 8932 (1971), *reprinted in* A. Lowenfeld, Aviation Law Documents Supplement at 975–984 (2d ed. 1981).

**5.** Additional Protocol Nos. 1–4 to Amend the Convention for the Unification of Certain Rules Relating to International Carriage by Air, ICAO Nos. 9145–9148 (1975), *reprinted in* A. Lowenfeld, Aviation Law Documents Supplement at 985–1001 (2d ed. 1981).

The consensus seems to be that "there is no longer any need to provide special protection to an industry which is capable of reimbursing customers for the damages it causes them." Comment, *The Growth of American Judicial Hostility to the Liability Limitations of the Warsaw Convention*, 48 J. Air L. & Com. 805, 830 (1983). Moreover, it has been noted that domestic airlines managed to flourish without a similar limitation placed on liability. 1 *Aviation Accident Law* § 11:01[5].

The second, related, criticism of the treaty limitation has been that liability limitations are "an affront to the American ideal of full and adequate compensation to injured plaintiffs by those responsible for the harm." *Id.* American courts operate under the principle that "[i]t is absolutely basic and fundamental ... that an injured person should be appropriately compensated for the loss he sustained." L. Kriendler, *A Plaintiff's View of Montreal*, 33 J. Air L. & Com. 528, 530 (1967). Within our system of law, the imposition of a maximum recovery, without regard to the amount of damages which may be proven, is a significant deviation from traditional American tort law principles. *See* 1 *Aviation Accident Law*, § 11:01[4].

The two major criticisms together, that a limitation on tort recovery is anathema to traditional American legal principles and that the air industry has long since outgrown the need for special protection, combine for a forceful argument against continued application of the liability limits found in the Convention. "It is not insignificant to note however, that the original policy has lost a great deal of its persuasive force; air travel is no longer an infant industry." 1 *Aviation Tort Law* § 11:04. Nevertheless, the fact remains that the United States is a High Contracting Party to the Warsaw Convention, complete with treaty limitation. While this may be at variance with traditional tort law, as long as the political branches of our government choose to adhere to the Convention, the courts of the nation are obliged to enforce it as it was negotiated and written. *Trans World Airlines, Inc. v. Franklin Mint Corp.*, 466 U.S. 243, 275,

104 S.Ct. 1776, 1794, 80 L.Ed.2d 273 (1984) (Stevens, J., dissenting).

**B.** *Interpretations of the Treaty Limitation*

It is well established that treaty interpretation involves a consideration of the history and intent of the contracting sovereigns. *Choctaw Nation v. United States*, 318 U.S. 423, 63 S.Ct. 672, 87 L.Ed. 877 (1943). Treaties are to be construed liberally but are not deemed to be abrogated or modified unless such intent has been clearly expressed. "Legislative silence is not sufficient to abrogate a treaty." *Trans World Airlines, Inc. v. Franklin Mint, Corp.*, 104 S.Ct. at 1783. Further, the Warsaw Convention being a treaty of voluntary adhesion, should the political branches of our government determine that the treaty obligations have become more onerous then the foreign policy considerations justify, the treaty's provision for denunciation could be invoked again. For this reason, "[p]lainly, a party to a treaty of voluntary adhesion can have no need for the doctrine of *rebus sic stantibus* [changed circumstances], except insofar as it might wish to avoid the notice requirement [Article 39]." *Id.* at 1783, n. 24. If the adhering nations have no use of the doctrine, then clearly private parties such as these may not invoke the doctrine on their behalf. *Id.* at 1783.

And yet American courts, faced with the prospect of enforcing a limitation which has become outmoded and contrary to domestic law, have taken avoidance of the treaty limitation upon themselves and have arrived at an interpretation of the Warsaw system which, in cases such as those presented by Plaintiffs here, eliminates the treaty limitation altogether. There are two provisions in the Warsaw Convention which, as a sanction, strip the limitation of liability from an air carrier. First, there is the "wilful misconduct" section, Article 25, which excepts from the limitation those cases in which a plaintiff can prove that the accident generating the action was caused by the carrier's "wilful misconduct," which is to be defined by the court of law to

which the case is submitted. Since the plaintiff's burden under this provision is a heavy one, this Article provides little ground from which to attack the limitation.

Consequently, the majority of courts have addressed the issue through judicial interpretation of Article 3.[6] This provision has provided much space for judicial maneuverings and innovative interpretations. Specifically, Article 3(2) provides that:

The absence, irregularity, or loss of the passenger ticket shall not affect the existence or the validity of the contract of transportation, which shall nonetheless be subject to the rules of this convention. Nevertheless, *if the carrier accepts a passenger without a passenger ticket having been delivered he shall not be entitled to avail himself of those provisions of this convention which exclude or limit his liability.* (emphasis added).

By providing for unlimited liability where there has been "nondelivery" of a passenger ticket, this Article of the Warsaw Convention has been given a construction, in conjunction with the Montreal Agreement, which eliminates the limitation for many plaintiffs.

1. "Adequate notice"

Construing the phrase "accept a passenger without a passenger ticket having been delivered" to include physically delivered tickets which fail to contain "adequate notice" of the Warsaw/Montreal limitation, courts have made a way for full recovery where there was none. In a line of cases beginning with *Mertens v. Flying Tiger Line, Inc.*, 341 F.2d 851 (2d Cir.), *cert. denied*, 382 U.S. 816, 86 S.Ct. 38, 15 L.Ed.2d 64 (1965), through the most recently decided *In re Air Crash Disaster at Warsaw, Poland on March 14, 1980, supra*, increasing importance has been placed on the passenger's need to know that in the case of tragedy during international air travel his recovery will be severely limited. "Adequate notice," ordinarily thought of as a domestic legal concept, has been judicially written into the Convention, in order to give "substance" to the provision regarding passenger tickets.

Ironically, a dissenting view in *Lisi* may have been premonition of the developments to come. Noting that "[t]he majority do not approve of the terms of the treaty and, therefore, by judicial fiat they rewrite it." *Lisi v. Alitalia Linee Aeree Italiane S.p.A.*, 370 F.2d at 515 (Moore, J. dissenting), the dissent termed the court's action in what was a turning point in the law "judicial treatymaking." *Id.* Further, Judge Moore noted that "[w]ere actual notice to be the requirement, every airline would have to have its agents explain to every passenger the legal effect of the treaty and, in all probability, insist that each passenger be represented by counsel who would certify that he had explained the import of the Convention to his client who, in turn, both understood and agreed to the limitation." *Id.* While it may be overstated, the hypothetical does drive home the point that preoccupation with the type size has less to do with "adequate notice" than with rejection of the limitation.

Although Article 3(1)(e) specifies that a passenger ticket shall contain "[a] statement that the transportation is subject to the rules relating to liability established by this convention," Article 3(2) says nothing regarding the "adequacy" of notice or any other particulars of the required statement. A literal reading of the provision would seem to indicate that the Convention is intended to apply regardless of whether or not the physical ticket is retained once it has been delivered into the possession of the passenger; certainly, there is no requirement that it be read by the passenger. Also, defects in the physical ticket are not to interfere with the enforceability of the liability rules. Indeed, inadequate notice through the statement could be considered an "irregularity" or defect in the passenger ticket which "shall not affect the existence or the validity of the contract of transpor-

---

**6.** The limitation has been attacked on constitutional grounds as well, *see, e.g., In re Aircrash in Bali, Indonesia on April 11, 1974*, 684 F.2d 1301 (9th Cir.1982); *Burdell v. Canadian Pacific Airways*, 10 Av.Cas. (CCH) ¶ 18,151 (Ill.Cir.Ct. 1968).

tation, which shall nonetheless be subject to the rules of this convention."

Nevertheless, in *Mertens v. Flying Tiger Line, Inc.*, the Second Circuit found that physical delivery of a ticket once the passenger has boarded the airplane is inadequate and constitutes "nondelivery" under Article 3(2). The court stated: "We read Article 3(2) to require that the ticket be delivered to the passenger in such a manner as to afford him a reasonable opportunity to take measures to protect himself against the limitation of liability.... The delivery requirement of Article 3(2) would make little sense if it could be satisfied by delivering the ticket to the passenger when the aircraft was several thousand feet in the air." 341 F.2d at 856–857. However, the situation presented to the *Mertens* court involved *physical* delivery of the passenger ticket. While it is not surprising that an American court would find it necessary that notice, once required, be given "in such a manner as to afford [the passenger] a reasonable opportunity to take self-protective measures", a notice requirement is nowhere within the treaty nor is the Article 3(1)(e) statement linked with the limitation.

The definition of "adequate notice" found in *Mertens* was dependent upon the timing of the physical delivery of the ticket. The court found that the ticket containing notice must be delivered in circumstances allowing the passenger to obtain additional protection, if desired. Given that the *Mertens* court had decided that the limitation was such an alarming prospect for a passenger to face, it is not surprising that the standard for permitting the limitation to stand and for protecting the passenger against the limitation became strict notice of the limitation.

In *Warren v. Flying Tiger Line, Inc.*, 352 F.2d 494 (9th Cir.1965), the court followed the reasoning in *Mertens* and held that the very inclusion of a requirement to provide a statement of the applicability of the Convention's limitation meant that "[t]he purpose of such a statement is to notify passengers of the applicability of Convention, thus affording them an oppor-

tunity to take steps to protect against the limitation of liability." 352 F.2d at 497. The Ninth Circuit expanded the *Mertens* holding, stating that there is an "implied requirement of Article 3(2), that delivery of the passenger ticket be made sufficiently in advance of the flight so that the passenger may, if he desires, obtain additional insurance protection." 352 F.2d at 498.

Occurring before the Montreal Agreement became effective, and indeed, before the United States threatened denunciation of the Warsaw Convention, these cases did not rely on the nature or size of the print found on the passenger ticket. Nonetheless, the courts managed to sidestep the limitation and provide what is already proper under domestic law: full recovery to injured plaintiffs.

Then, almost immediately following these cases, again before the Montreal Agreement, focus began to be placed on the "adequacy of notice" as related to the print of the ticket. A landmark case, *Lisi v. Alitalia-Linee Aeree Italiane*, 253 F.Supp. 237, 239 (S.D.N.Y.), *aff'd.*, 370 F.2d 508 (2d Cir.1966), *aff'd. by equally divided court*, 390 U.S. 455, 88 S.Ct. 1193, 20 L.Ed.2d 27 (1968), held that "compliance with the Convention requires not mere physical delivery of a ticket and check before departure but delivery of a ticket and check which notify the passenger that the provisions of the Convention which exclude or limit liability are applicable." Having phrased the question with respect to Article 3(2) as one of "adequate notice," the lower court in *Lisi* went on to find that the notice of the applicability of the liability limitations was in fact inadequate because it was printed in "microscopic type," "camouflaged in Lilliputian print in a thicket of 'Conditions of Contract.'" 253 F.Supp. at 243. Further, the court found that the required statement was "ineffectively positioned, diminutively sized, and unemphasized by bold face type, contrasting color, or anything else. The simple truth is that they are so artfully camouflaged that their presence is concealed." *Id.* In effect, then, the court found that even with advance physical delivery, without a properly legible statement of the limitation, there

could be no delivery of the ticket. In this way, the court rewrote that provision in the convention which states that failure to include the statement of limitation on liability *does not* affect the applicability of the Convention's rules. While the *Lisi* court may well have construed that the diminutive statement was equivalent to no statement at all, it seems at least somewhat extreme to have extrapolated this fact to non-delivery of the entire contract of carriage. Article 3(2) appears directed to the *entire* ticket, which is evidence that a contract has been formed, and appears much less concerned with notice of limitation on liability than American courts have imputed to the drafters of the treaty.

> On appeal, the Second Circuit noted that The Convention's arbitrary limitations on liability—which have been severely and repeatedly criticized—are advantageous to the carrier. But the *quid pro quo* for this one-sided advantage is delivery to the passenger of a ticket and baggage check which give him notice that on the air trip he is about to take, the amount of recovery to him or his family in the event of a crash, is limited very substantially. Thus the passenger is given the opportunity to purchase additional flight insurance or to take such other steps for his self-protection as he sees fit.

370 F.2d at 512–513. Again, the court was concerned with giving the Convention meaning; this meant giving the passenger "notice" of the position he was placing himself in by traveling internationally by air. Moreover, it has generally been agreed that the *quid pro quo* for the limitation is, not notice, but liability without fault. Even at the Hague Conference, liability as determined under the "wilful misconduct" provision was linked to the attempts to raise the limitation. Lowenfeld & Mendelsohn at 505. There is no evidence that the treaty drafters and signatories intended "adequate notice" to affect the operation of the treaty limitation.

There is in fact evidence to the contrary. In *Ludecke v. Canadian Pacific Airlines, Ltd.*, 98 D.L.R.3d 52 (Can.1979), *rev'g* 53 D.L.R.3d 636 (Que.C.A.1974), *aff'g in part*

*and rev'g in part*, 12 Av.Cas. (CCH) 17,191 (Que.Super.Ct.1971), the reasoning which has developed in *Mertens, Warren* and *Lisi* was considered and rejected. In *Ludecke,* the Supreme Court of Canada found:

> the words of art. 3(2) are plain and can admit of no misunderstanding. The absence, irregularity or loss of a passenger ticket will not affect the existence or the validity of the contract of carriage. The benefit of the limitation will be lost only where no ticket is delivered. The American cases referred to above which hold that delivery of a ticket with an irregularity, that is, a statement as required by art. 1(e) which is illegible, amounts to no delivery of a ticket, ignore this plain language and fail to give effect to a precise statement of the law. I am unable, however harsh and unreasonable I may consider the limitation, to adopt the American test.

Given the history of discontent with the limitation, it seems that the decisions rendered in these cases were directed toward correcting what is admittedly an inequitable burden as presently borne between carriers and passengers. Instead of giving weight to the history of the Warsaw/Montreal system, the courts have managed to interpret an additional waiver provision into the treaty.

Following the acceptance of the Montreal Agreement and the United States withdrawal of its Notice of Denunication, the courts have continued to view with disapproval the limitation on air carrier liability. Judicial circumvention of the treaty limitation has taken a slightly different direction upon United States acceptance of the Montreal Agreement. Instead of focusing upon the timing of physical delivery, as in *Warren* and *Mertens,* the *Lisi* concern with the statement, which is never referred to as "notice" in the Convention itself, and the size of the print, increasingly became the focal point for attack.

### 2. 10–Point type size requirement

As early as 1963, before the Montreal Agreement, the Civil Aeronautics Board promulgated regulations for air carriers

which required the statement of applicability of the limitation to be printed in at least 10–point modern type size on paper of contrasting color. *See* 14 C.F.R. § 221.175(a). In *Deutsche Lufthansa Aktiengesellschaft v. C.A.B.,* 479 F.2d 912 (D.C.Cir.1973), this Circuit Court of Appeals rejected the petitioning air carrier's argument that promulgation of the C.A.B. regulation conflicted with the Warsaw Convention and exceeded the agency's authority. The Circuit Court first found that the terms of Article 3 do not preclude the addition of more specific requirements regarding the statement. Further, the court found that "[t]he recent trend of appellate court decisions has been to accord substance to the protections that Article 3 of the Convention intended to provide airline passengers." 479 F.2d at 917. The court continued to find that "[t]he passenger is to receive full and effective notice of any limitations of liability so that alternative protection may be obtained." *Id.* The *Deutsche Lufthansa* case first determined that the C.A.B. regulations are valid and do not contravene the purposes of the treaty; in making this finding the Circuit also accepted the *Lisi* holding that "unless adequate notice is accorded its passengers, the carrier will later be precluded from using the Convention to limit liability." *Id.* at 918. In dicta surrounding the challenge to the domestic regulation, this Circuit noted that compliance with the regulation will not only provide passengers with adequate notice of the limitations on liability imposed on them but will later enable the carrier to invoke the protection of § 3(1)(e); however this Circuit Court did not and has not yet addressed the question of what constitutes "adequate notice."

Having gone beyond the question of whether notice is required by the treaty, the question of just what constitutes "adequate notice" was addressed by the Second Circuit in *In re Air Crash Disaster of Warsaw, Poland on March 14, 1980,* 705 F.2d 85 (2d Cir.1983). Essentially, the Court accepted the premise that the statement *must* provide notice of the limitation in order for the limitation to apply. From this premise, the Court progressed to a determination of "adequate notice." The Second Circuit decided that the "bright line" for "adequacy of notice" should be drawn at the 10–point type requirement found in both the C.A.B. regulation and the Montreal Agreement. Thus, the 10–point type requirement has been grafted onto the treaty as the next phase in the attempt to circumvent the treaty provision. *In re Air Crash Disaster at Warsaw, Poland,* went so far as to construe the "special contract" that was the Montreal Agreement as part and parcel of the treaty, and indeed, to place that new, "modified" provision just where the courts wanted it to be.

Construing the Article in this way is intended to give it a meaning parallel to that found in American law, but does not accord the treaty provision the meaning evident from the negotiation and debate which led to its promulgation. Nothing in the Montreal Agreement requires that an air carrier provide the statement of liability limitation in 10–point type or lose the benefit of that limitation. Nothing in the debate or dissatisfaction with the limitation which led to the Montreal Agreement confirms the contention that "adequate notice" was an issue. At the core of the debate the dissatisfaction content with the very existence of the limitation; the erosion of the circumstances in which carriers may avail themselves of that limitation is the result of judicial frustration at the fact that courts are prevented from fully compensating plaintiffs, especially victims of air tragedies such as presented in this case. This disturbing feature of the treaty has not been eradicated through political process.

While American courts may be justifiably frustrated with the anachronism which the treaty limitation has become, it is not within the province of the judiciary to alter the *quid pro quo* agreed to by the political branches. It has been generally understood that in exchange for virtual strict liability against air carriers, international passengers are limited in their recovery. The "special contract" known as the Montreal Agreement supplemented the *quid pro quo* by raising the amount of the

limitation and waiving the carriers' defenses under Article 20 leaving only the presumption of liability. It also supplemented the Article 3 requirements that a statement be included in the passenger ticket by providing specifics to be provided by carriers stopping in the United States; it did not alter the *quid pro quo* by linking Articles 22 and 20 with Article 3.

In any case, the political branches are vested with the power and authority to make express their intent regarding the enforceability of the treaty limitations in cases where the C.A.B. regulation and Montreal Agreement directive for 10–point type has been violated. However, the United States must be explicit if it is its intent to abrogate the obligation to enforce the treaty limitation in cases such as these Plaintiffs present. The Court notes that were the violation of the regulation for 10–point type and the carrier agreement indeed crucial, a more appropriate sanction would be to prohibit the recalcitrant carriers from engaging in air transportation to or from the United States. While the Government does not have the unilateral power or authority to be rid of the treaty limitation altogether (even the earlier threat of denunciation by the largest participant in international aviation could not accomplish this) the Government could suspend the operating permits of those carriers who do not abide by our domestic laws and regulations. 49 U.S.C. § 1372. The 10–point type-size regulation is such a domestic requirement. While the carriers agreed to it in the Montreal Agreement as well, the foreign air carriers are *not* the contracting parties to the treaty. Therefore, Plaintiffs' argument that this carrier was on notice that it would be stripped of limited liability for failing to provide "adequate notice" must fail. While it is indeed correct that the Montreal Agreement must be read in connection with the Warsaw Convention, the resulting Warsaw/Montreal system does not include delimiting liability for failure to provide the statement in 10–point type size. In short, the Montreal Agreement may not be read wholesale into the Warsaw Convention.

Although Plaintiffs derive their argument linking the treaty sanction to the statement from case precedent, the basic flaw in their argument is the assumption that the Montreal Agreement can operate as an amendment to the Warsaw Convention; it cannot. Under the Convention's provisions, the carrier and the passenger may agree to a higher limit of liability. While the limit may be raised, nothing in the "special contract" provision allows it to be completely removed. There is nothing in the "special contract" provision which allows the carrier to waive it defenses under Article 20. However, an express, written agreement to waive those defenses, which the Montreal Agreement contains, should be honored by the courts. Waiver by express agreement is not claimed by these Plaintiffs. Defendant Korean Air Lines, having agreed to the Montreal Agreement has come forward to make an express denial of waiver in these circumstances. Were the Court faced with a clear, political decision to avoid the treaty limitation where there has not been "adequate notice," however defined, or were it faced with an express waiver, as with the Article 20 defenses, then a different decision would be possible.

■ Putting aside for the moment the question of whether the Montreal Agreement may amend the treaty, the principle concern in adopting the Agreement was the United States threat to withdraw from the Convention; notice of the limitation's operation was *not* an issue. Where the political branches have been stymied, "judicial treatymaking" to include notice has proved irresistable to some courts. In the view of this Court, treaty revision is not the right or responsibility of the judicial branch. Moreover, the Executive Branch has recognized the continued vitality in the Warsaw Convention. In its *amicus curiae* brief in the *Franklin Mint* case, the United States cautioned against rendering the treaty limitation entirely unenforceable. While not addressing the exact question which faces this Court, the Government brief noted that "The United States remains committed to the Convention as the basic instrument governing questions of liability in the inter-

national aviation industry." *Amicus Curiae* Brief of the United States, at 2. *Trans World Airlines, Inc. v. Franklin Mint Corp.*, 466 U.S. 243, 104 S.Ct. 1776, 80 L.Ed.2d 273 (1984). As the Supreme Court noted in its decision in the case, "when the parties to a treaty continue to assert its vitality a private person who finds the continued existence of the treaty inconvenient may not invoke the doctrine on their behalf." *Trans World Airlines, Inc. v. Franklin Mint*, 104 S.Ct. at 1783. Since the branches of Government vested by the Constitution with the power to make and break treaty obligations continue to assert the utility of the Convention, and to assert the enforceability of the treaty limitation, these private citizens may not, indeed, the Court may not define the treaty limitation out of existence, even in narrow circumstances. That task, difficult though it has proven to be, has been assigned to the legislative and executive branches of our Government.

### 3. Immediate Payment of $75,000

In addition to seeking unlimited liability against Korean Air Lines, Plaintiffs have requested an immediate payment of $75,000 as partial damages. Plaintiffs misconceive the nature of the limitation. The $75,000 limitation on air carrier liability is a maximum, not a minimum, on the amount of damages which a plaintiff may receive, *once he has proven his damages.* While the Montreal Agreement subjects air carriers to virtual strict liability, air carriers are not automatically liable for an amount of $75,000. The limitation does not operate as would insurance; Plaintiffs are still required to prove the amount of their damages and are entitled to receive only the amount which they can prove.

Moreover, the nature and amount of unliquidated damages cannot be proved in a motion for summary judgment. Since the amount of damages must be established on an individual basis, there are still material issues of fact which remain to be tried. Defendant cannot be precluded from conducting discovery with which to defend against Plaintiffs' claims. There being material issues of fact with respect to the amount of individual damages, it would be entirely inappropriate to award the maximum damages. The request for immediate payment of $75,000 must be denied.

### CONCLUSION

"Judicial predilection for their own views as to limitation of liability should not prevail over the limitations fixed by the legislative and executive branches of Government even though this result is obtained by ostensibly adding to the treaty a requirement of actual understanding notice." *Lisi v. Alitalia Linee Aeree Italiane*, 370 F.2d at 515 (Moore, J., dissenting). The Montreal Agreement is not a negotiated amendment to the Warsaw Convention. Even if the Agreement could rise to the level of an amendment to the treaty, which it cannot, the principle of law requiring clear expression of the intent of the political branches would prevent a finding that the treaty is to be abrogated. Plaintiffs' construction is not supported by the negotiating history of the Warsaw/Montreal System.

It may be arguable that American courts have been justified in arriving at the conclusion that the Montreal Agreement affects the application of the treaty sanction since the Agreement applies only to transportation including the United States; however, such an interpretation rejects the fact of the clear intransigence of a majority of High Contracting Parties to the Convention with regard to delimiting carrier liability. There is every indication that the majority of the more than 120 nations adhering to the Convention intend to continue the special protection afforded international carriers, even at the expense of international passengers. In light of this intransigence, it is especially inappropriate for the Court to interpret the treaty provisions in such a way as to relieve the United States of its treaty obligations. In addition, the Montreal Agreement contains no expression of the carriers intent to waive the limitation. In fact, it makes no mention at all of the sanction to be imposed for a carrier's failure to include proper notice to passengers. Making tolerable an intolerable treaty provision is simply not the province of the courts. Therefore, for the foregoing rea-

**1478**

sons, the motion for partial summary judgment against Korean Air Lines shall be DENIED.

An appropriate Order accompanies this Memorandum.

### ORDER

In accordance with the Memorandum entered this date, it is by the Court this 25th day of July, 1985,

ORDERED, that Plaintiffs' Motion for Partial Summary Judgment Against Defendant Korean Air Lines Co., Ltd. is DENIED; and it is

FURTHER ORDERED, that Korean Air Lines Co., Ltd., is entitled to avail itself of the limitation on damages provided by the Warsaw Convention and raised to $75,000 by the Montreal Agreement; and it is

FURTHER ORDERED, that Plaintiffs may not receive immediate payment of $75,000, there being material issues of fact with respect to the amount of unliquidated damages.