**CHUBB & SON, INC., As subrogee of Samsung Semiconductor, Plaintiff–Appellant,**

v.

**ASIANA AIRLINES, Defendant–Appellee.**

**Docket No. 99–7617.**

United States Court of Appeals, Second Circuit.

Argued Nov. 19, 1999

Decided June 8, 2000

Daniel G. McDermott, Donovon Parry Carbin McDermott & Radzik, New York, New York (William E. Ecenbarger, Jr., Donovon Parry Carbin McDermott & Radzik, New York, New York, of counsel) for Plaintiff–Appellant.

Christopher Carlsen, Condon & Forsyth LLP, New York, New York (Barry S. Alexander, Condon & Forsyth LLP, New York, New York, of counsel) for Defendant–Appellee.

Before: KEARSE, PARKER, POOLER, Circuit Judges.

PARKER, Circuit Judge:

Chubb & Son, Inc. ("Chubb"), as subrogee of Samsung Semiconductor, Inc. ("Samsung Semiconductor"), appeals from the judgment of the United States District Court for the Southern District of New York (Lorretta A. Preska, *Judge*) entered September 23, 1998, granting partial summary judgement to Asiana Airlines ("Asiana") and thereby limiting its liability to $706.00.

On this appeal we must determine under customary international law whether this dispute is governed by a treaty of the United States. Initially operating under the assumption that the dispute was governed by the Convention for the Unification of Certain Rules Relating to International Transportation by Air, Oct. 12, 1929, 49 Stat. 3000 (1934), 137 L.N.T.S. 11, *reprinted in note following* 49 U.S.C. § 40105 (the "Original Warsaw Convention"), the parties cross-moved for partial summary judgment as to whether Asiana could invoke Article 22(2) of the Original Warsaw Convention to limit its liability to $20.00 per kilogram of cargo lost, or $706.00. Sometime thereafter, Asiana sought leave to file a supplemental motion for summary judgment, asserting that the United States and South Korea[1] were not in treaty relations with regard to the Original Warsaw Convention because South Korea did not adhere to the Original Warsaw Convention, but adhered only to the amending agreement, known as the "Hague Protocol" and officially entitled "Protocol to Amend the Convention for the Unification of Certain Rules Relating to International Carriage by Air signed at Warsaw on 12 October 1929." Adhering to the Hague Protocol had the effect of adherence to the Convention as amended by the Protocol (the "Amended Warsaw Convention"). *See* Hague Protocol, Sept. 28, 1955, 478 U.N.T.S. 371, 387, art. XXIII(2). The court below concluded that the United States and South Korea were parties to a treaty consisting of the articles common to the Original Warsaw Convention and the Amended Warsaw Convention, and applied that treaty to limit Asiana's liability to $706.00. For the reasons that follow, we reverse the order of the district court and remand for further proceedings.

## I. BACKGROUND

A. *The Undisputed Facts of the Underlying Dispute*

The facts relevant to the determination of this appeal are undisputed. In 1995, Asiana, a South Korean corporation, agreed with Samsung Electronics Co., Ltd. ("Samsung"), another South Korean corporation, that Asiana would ship seventeen parcels of computer chips from Seoul, South Korea, to San Francisco, California pursuant to Asiana air waybill No. 988–0497–2951 (the "Waybill"), with Samsung Semiconductor as the intended recipient. The Waybill provided that shipment of the seventeen parcels would be made on Asiana Flight 214 from Seoul, South Korea to San Francisco, California on August 10, 1995. The Waybill did not refer to any other stops en route and Flight 214 had no other scheduled stops.

The seventeen parcels were delivered to Asiana for shipment. Due to an excess of goods to be shipped, however, Asiana transported the parcels on Asiana Flight 202 from Seoul, South Korea to Los Angeles, California, and thereafter trucked the parcels to San Francisco. Asiana did not inform Samsung or Samsung Semiconductor in writing of this change, nor did it conform the Waybill to this change. Upon

---

1. On August 15, 1945, Korea was liberated from Japan, and on August 15, 1948, the Republic of Korea was established in the southern portion of Korea. *See* U.S. Department of State, Bureau of East Asian and Pacific Affairs, Background Notes: South Korea, October 1998 <http://www.state.gov/www/background notes/south korea 1098 bgn.html.> The Republic of Korea is commonly referred to as South Korea. *Id.*

delivery in San Francisco, two of the seventeen parcels were missing. Neither party has been able to locate the parcels. The two missing parcels weighed a combined 35.3 kilograms and contained $583,-000 worth of computer chips.

The owner and intended recipient of the computer chips, Samsung Semiconductor (a subsidiary of Samsung), had insured the chips against loss or damage through a cargo insurance policy issued by Chubb. Upon Samsung Semiconductor's claim of loss, Chubb paid Samsung Semiconductor $583,000 plus an additional amount based on the terms of the cargo insurance policy.

## B. *The Proceedings Below*

On July 3, 1996, Chubb, as subrogee of Samsung Semiconductor, commenced this action against Asiana in the District Court for the Southern District of New York, seeking to recover the value of the lost computer chips, plus the remaining amount paid by it under the terms of the cargo insurance policy. The parties cross-moved for partial summary judgement on the issue of whether Asiana could invoke Article 22(2) of the Original Warsaw Convention to limit its liability. Judge Preska referred the motion to Magistrate Judge Peck for a report and recommendation.

Asiana argued that it could invoke Article 22(2), which limits an air carrier's liability to $20.00 per kilogram of cargo lost, here $706.00, and offered $800.00 to settle the case. Chubb argued that Asiana could not avail itself of the liability limitation in Article 22(2) because it failed to comply with Article 8(c) of the Original Warsaw Convention. Article 9 of the Original Warsaw Convention precludes an air carrier from availing itself of the liability limitation in Article 22(2) if "the air waybill does not contain all the particulars set out in article 8(a) to (i), inclusive, and (q)." Original Warsaw Convention, *supra*, art. 9, 49 Stat. at 3017. Article 8(c) requires that the air waybill contain "[t]he agreed stopping places" for the shipment. Original Warsaw Convention, *supra*, art. 8(c), 49

Stat. at 3016. In this case, the Waybill did not contain any stopping places, but Asiana nonetheless stopped in Los Angeles. Magistrate Judge Peck issued a well-reasoned and well-supported Report and Recommendation, recommending that Chubb's motion be granted and Asiana's motion be denied because, having failed to comply with Article 8(c), Asiana could not limit its liability under Article 22(2).

While the parties' objections to the Report and Recommendation were pending before the district court, Asiana sought leave to file a supplemental motion for summary judgment, questioning the court's subject matter jurisdiction pursuant to 28 U.S.C. § 1331. Up until this point, the parties and the court had assumed subject matter jurisdiction based on their belief that the dispute arose under a treaty of the United States, i.e., the Original Warsaw Convention. Because this issue potentially affected subject matter jurisdiction, the district court granted leave.

Asiana argued that the United States and South Korea were not in treaty relations with regard to the Original Warsaw Convention because the United States adhered only to the Original Warsaw Convention and South Korea adhered only to the Hague Protocol, which had the effect of adhering to the Amended Warsaw Convention. Asiana argued that the district court nevertheless had jurisdiction under a treaty consisting of all of the articles common to the Original Warsaw Convention and the Amended Warsaw Convention (hereinafter referred to as the "Truncated Warsaw Convention"). Chubb agreed that the district court had jurisdiction, but contended that the Original Warsaw Convention applied. On September 18, 1998, the district court granted Asiana's supplemental motion for partial summary judgment, agreeing with Asiana that the United States and South Korea were parties to this Truncated Warsaw Convention, and finding that Asiana's liability under this "treaty" was limited to $706.00. As a re-

sult, the district court denied the prior-cross motions as moot.

The district court discussed the interplay between the Original Warsaw Convention and the Hague Protocol and reasoned that the United States and South Korea had agreed to be bound by all of the provisions of the Original Warsaw Convention to which they both adhered. *See Chubb & Son, Inc. v. Asiana Airlines,* 1998 WL 647185, at *2-*3 (S.D.N.Y. Sept.22, 1998). The court observed that States that adhere to a multilateral treaty enter into treaty relations with the other States that adhere to the treaty, regardless of whether those States adhere to the treaty contemporaneously. *See id.* at *5 Thus, according to the court, the United States and South Korea entered into treaty relations when South Korea adhered to the amended version of the treaty. *See id.* at *6.

In reaching this conclusion, the court relied on *In re Korean Air Lines Disaster of September 1, 1983,* 664 F.Supp. 1463 (D.D.C.1985), *aff'd,* 829 F.2d 1171 (D.C.Cir. 1987), *aff'd sub nom. Chan v. Korean Air Lines, Ltd.,* 490 U.S. 122, 109 S.Ct. 1676, 104 L.Ed.2d 113 (1989),[2] and *Hyosung (America), Inc. v. Japan Air Lines, Ltd.,* 624 F.Supp. 727 (S.D.N.Y.1985), the only two cases that discuss the existence of treaty relations between the United States and South Korea with regard to international carriage by air. *See Chubb,* 1998 WL 647185, at *6. The court interpreted both cases to hold that treaty relations between the United States and South Korea existed to the extent of those portions of the Original Warsaw Convention to which they both adhered, i.e., the Truncated Warsaw Convention. *See id.* at *5. The court noted, however, that unlike this case,

the courts in *Korean Air Lines Disaster* and *Hyosung* were not confronted with the invocation of articles that had been amended by the Hague Protocol. *See id.* at *6 ("To be sure, the substantive legal issues in *Korean Air Lines Disaster* and *Hyosung* involved only unamended portions of the Convention, and as such differ from this case, where one party seeks to rely on a Convention provision that was, in fact, amended by the Protocol.").[3] In this case, Chubb invoked Article 8(c) of the Original Warsaw Convention, which was substantively amended by the Hague Protocol to remove the requirement of disclosing all "additional stopping places" on an air waybill. *See* International Air Transport Association, Principal Instruments of the Warsaw System 8 (3d ed.1991) (comparing Original Warsaw Convention to Hague Protocol).

Article 18 of the Original Warsaw Convention, which provided that the carrier shall be liable for damages sustained in the event of loss of goods, had not been amended. *See id.* at 16. Article 22 had been amended in form, but retained the same liability limitation. *See id.* at 18–20. Despite that Article 8(c) of the Original Warsaw Convention was implicated by the facts and invoked by the plaintiff in this case, because it had been amended, the court held that Article 8(c) was not part of the agreement between the United States and South Korea and therefore could not be invoked by Chubb. *See Chubb,* 1998 WL 647185, at *6–*7. Thus, under the Truncated Warsaw Convention created by the district court, Article 18 created the cause of action, and Article 22(2) limited Asiana's liability to $20.00 per kilogram of cargo lost. *See id.* The court did not discuss the possible prejudice to the Unit-

---

**2.** The conclusion of the district court in *Korean Air Lines Disaster* regarding treaty relations between the United States and South Korea was not challenged or addressed on direct appeal to the Court of Appeals for the District of Columbia Circuit or in the Supreme Court.

**3.** This observation was incorrect as to *Korean Air Lines Disaster,* where the court was confronted with a provision substantively amended by the Hague Protocol. *See Korean Air Lines Disaster,* 664 F.Supp. at 1474–75 (applying original Article 3 despite that it was amended by the Hague Protocol).

ed States or South Korea, or the parties, that may be caused by interpreting the actions of the United States and South Korea in this manner.

Chubb moved in the district court to certify for appeal the questions decided in the September 18, 1998 Memorandum & Order. On December 14, 1998, the district court certified the questions. By Mandate issued May 28, 1999, this Court granted Chubb's petition for permission to appeal pursuant to 28 U.S.C. § 1292(b).

## II. DISCUSSION

A. *Relations between the United States and South Korea within the Warsaw Convention "System"*

The Warsaw Convention "system" includes the various laws, treaties and individual contracts governing the international transportation of persons, baggage, and goods by air. No one treaty or contract governs the relationships of one State with other States. A single State might be bound to one version of the Warsaw Convention with one State, another version of the Warsaw Convention with another State, a separate bilateral treaty with another State, and a separate contract with a private party. *See Korean Air Lines Disaster,* 664 F.Supp. at 1469 (United States bound to at least a portion of Warsaw Convention with South Korea and bound to separate contract with Korean Air Lines); *cf. In re Air Disaster at Lockerbie, Scotland on Dec. 21, 1988,* 928 F.2d 1267, 1270 (2d Cir.1991) ("So much has been written concerning the Convention since its adoption over 50 years ago that we must take care not to get lost in a wilderness of words."). For purposes of this case, we are concerned only with the actions of the United States and South Korea.

In 1934, the United States adhered to the Original Warsaw Convention and the Senate ratified the treaty. The treaty entered into force for the United States on October 29, 1934. *See* United States De-partment of State, Treaties in Force 342 (1999); 49 Stat. at 3013. At the time the Senate ratified the treaty, the United States (and the world) was in the midst of the Great Depression and the liability provisions in the treaty were thought to provide some benefit to carriers, passengers, and shippers alike. *See* Jon P. Martin, *Tseng v. El Al Israel Airlines, Ltd.: The Second Circuit Further Weakens the Warsaw Convention,* 31 Conn. L.Rev. 297, 300 & nn. 14–17 (1998); Andreas F. Lowenfeld & Allan I. Mendelsohn, *The United States and the Warsaw Convention,* 80 Harv. L.Rev. 497, 499–500 & n. 12 (1967) (quoting *Senate Comm. on Foreign Relations, Message from the President of the United States Transmitting a Convention for the Unification of Certain Rules,* Sen. Exec. Doc. No. G, 73d Cong., 2d Sess. 3–4 (1934)). In order to help the then-fledgling air industry, Article 22 of the Original Warsaw Convention limited the liability of air carriers to $8,300 per passenger and $20 per kilogram of goods or baggage. *See* Original Warsaw Convention, *supra,* art. 22, 49 Stat. at 3019; *Lockerbie,* 928 F.2d at 1270–71 (discussing the goal of protecting infant airline industry). In exchange for this limitation, Article 20 created a rebuttable presumption of liability, and other articles created exceptions to Article 22's limited liability. Articles 8 and 9, for example, together created an exception where the air waybill did not contain certain "particulars." *See* Original Warsaw Convention, *supra,* arts. 8, 9, 20, 22, 49 Stat. at 3016–17, 3019.

With the growth of the world economy and the air industry, however, the liability limitation, and particularly the per-passenger limitation, became increasingly unpopular in this and other countries. In 1955, a conference convened at the Hague to resolve the question of whether the liability limits remained at an appropriate level. The result was the Hague Protocol. The Hague Protocol, *inter alia,* changed some outdated language, doubled the per-passenger liability limitation to $16,600, and

removed most of the exceptions to limited liability for shippers of goods. *See generally* International Air Transport Association, *supra*.

The United States was not satisfied that the increase in per-passenger liability was sufficient, and did not ratify the Hague Protocol. *See* Treaties in Force, *supra*, at 342 n. 1; *Senate Comm. on Foreign Relations, Message from the President of the United States Transmitting Two Related Protocols to the Convention for the Unification of Certain Rules Relating to International Carriage by Air, as Amended,* Sen. Exec. Doc. No. B, 95th Cong., 1st Sess. V (1977) (*"Message Transmitting Two Related Protocols"*). On July 13, 1967, South Korea adhered to the Hague Protocol, but did not separately adhere to the Original Warsaw Convention. *See id.;* M.J. Bowman and D.J. Harris, Multilateral Treaties: Index and Current Status 202 (1984). In sum, in 1995 when this dispute arose, the United States had ratified the Original Warsaw Convention but not the Hague Protocol, while South Korea had adhered to the Hague Protocol but not the Original Warsaw Convention.[4]

■ Whether this dispute arising out of the international carriage of goods by air is governed by a given substantive treaty, such as the Original Warsaw Convention or the Amended Warsaw Convention, depends on whether the places of departure and destination are within the territories of two contracting parties to that treaty. *See* Original Warsaw Convention, *supra,* art. 1(1)-(2), 49 Stat. at 3014 ("This convention shall apply to all international transportation of persons, baggage, or goods ... [where], according to the contract made by the parties, the place of departure and the place of destination ... are situated ... within the territories of two High Contracting Parties...."); Amended Warsaw Convention art. 1(1)-(2) (Original Warsaw Convention art. 1(1)-(2), as amended by the Hague Protocol, *supra,* art. I, 478 U.N.T.S. at 373, 375) (same). In this case, the carriage occurred between South Korea and the United States. Thus, if South Korea and the United States are both parties to the same one of these substantive treaties, they are in a treaty relationship that governs this dispute.

■ We determine whether States are parties to a substantive treaty by applying the customary international law of treaties, which governs the making, interpretation, amendment, modification, enforcement, etc., of treaties. "Customary international law results from a general and consistent

---

4. In 1965, the United States announced that it would denounce the Original Warsaw Convention unless the liability limit was raised, by special contract or otherwise. *See Korean Air Lines Disaster,* 664 F.Supp. at 1466; *Message Transmitting Two Related Protocols, supra,* at VI. In response to the Notice of Denunciation, private air carriers agreed to raise the per-passenger liability limitation to $75,000, to submit to virtual strict liability, and not to avail themselves of the defenses in the Original Warsaw Convention (the "Montreal Intercarrier Agreement of 1966"). *See id.* The Montreal Intercarrier Agreement was a "special contract" and thus did not amend the Original Warsaw Convention. Because the Montreal Intercarrier Agreement of 1966 affects only the international carriage of passengers by air, it does not affect this case.

After 1965, the United States made several failed attempts to adopt an amended version of the Original Warsaw Convention. It was not until September 28, 1998 that the United States finally ratified Montreal Protocol No. 4 to Amend the Convention for the Unification of Certain Rules Relating to International Carriage by Air Signed at Warsaw on 12 October 1929 as amended by the Protocol done at the Hague on 28 September 1955, Sept. 25, 1975, *Message Transmitting Two Related Protocols, supra,* at 7–17 ("Montreal Protocol No. 4"), and thereby acceded to the Warsaw Convention as amended by the Hague Protocol and as amended by Montreal Protocol No. 4. *See id.* art. XVII(2), S. Exec. Doc. No. B at 15. Because the actions giving rise to this suit occurred in 1995, Montreal Protocol No. 4 does not affect this case. *See* Restatement (Third) of the Foreign Relations of the United States § 322(1) (1986) (the "Restatement") ("[T]he provisions of an international agreement do not bind a party in relation to any act or fact that took place ... before the date of the entry into force of the agreement with respect to that party.").

practice of states followed by them from a sense of legal obligation." Restatement § 102(2). In some cases, the customary international law of a certain area is itself codified in a treaty. Such is the case with the customary international law of treaties, which to a large extent has been codified in the Vienna Convention on the Law of Treaties, May 23, 1969, 1155 U.N.T.S. 331 (the "Vienna Convention").

## B. *The Vienna Convention*

In resolving the question of whether a treaty relationship exists between the United States and South Korea with regard to the international carriage of goods by air, we apply the rules enunciated in the Vienna Convention. According to a widespread legal conviction of the international community, the Vienna Convention is largely a restatement of customary rules, "binding States regardless of whether they are parties to the Convention." Maria Frankowska, *The Vienna Convention on the Law of Treaties Before United States Courts*, 28 Va. J. Int'l L. 281, 286 (1988) (citing opinions of the International Court of Justice); *see* Vienna Convention, *supra*, 1155 U.N.T.S. at 333 (stating its purpose to be, *inter alia*, the "codification and progressive development of the law of treaties").[5]

The United States recognizes the Vienna Convention as a codification of customary international law. The United States Department of State considers the Vienna Convention "in dealing with day-to-day treaty problems" and recognizes the Vienna Convention as in large part "the authoritative guide to current treaty law and

practice." Frankowska, *supra*, at 298 (quoting Assistant Legal Advisor for Treaty Affairs at the Department of State and Secretary of State Roger's Report to the President, Oct. 18, 1971, 65 Dep't St. Bull. 684, 685 (1971)). In addition, the Department of State has stated that where it has not recognized the Vienna Convention as codifying customary international law, it has adopted it as customary law going forward. *See id.* at 300.

United States courts have also cited the Vienna Convention as an authoritative codification of customary international law. *See Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155, 191, 113 S.Ct. 2549, 125 L.Ed.2d 128 (1993) (Blackmun, J., dissenting) (citing Article 31.1); *Weinberger v. Rossi*, 456 U.S. 25, 29 n. 5, 102 S.Ct. 1510, 71 L.Ed.2d 715 (1982) (citing Article 2(1)(a)); *Aquamar, S.A. v. Del Monte Fresh Produce N.A., Inc.*, 179 F.3d 1279, 1296 n. 40 (11th Cir.1999) ("Although the United States is not a party to the Vienna Convention, it regards the substantive provisions of the Vienna Convention as codifying the international law of treaties.") (quoting *Kreimerman v. Casa Veerkamp S.A. de C.V.*, 22 F.3d 634, 638 n. 9 (5th Cir.1994)); *Tseng v. El Al Israel Airlines, Ltd.*, 122 F.3d 99, 104–05 (2d Cir.1997) (citing Articles 31 and 32), *rev'd on other grounds*, 525 U.S. 155, 119 S.Ct. 662, 142 L.Ed.2d 576 (1999); *Haitian Ctrs. Council, Inc. v. McNary*, 969 F.2d 1350, 1361–62 (2d Cir.1992) ("[P]rinciples of treaty construction are themselves codified, in Article 31 of the Vienna Convention.... We have previously applied the Vienna Convention in interpreting treaties, *Day v.*

---

**5.** The Vienna Convention does not apply as a matter of treaty law in this case because (1) the United States never ratified the Vienna Convention, *see* Basic Documents in International and World Order § 1.15 (Burns H. Weston et al. eds., 2d ed.1990) (showing that the United States signed but did not ratify and that South Korea ratified without qualification on April 27, 1977); and (2) the Vienna Convention is not retroactively applied to treaties in force, *see* Vienna Convention, *supra*, art. 4, 1155 U.N.T.S. at 334. The Vienna

Convention may nevertheless be used as a guide to the customary international law of treaties before it became effective, because the customary international law it codified existed separately before the Vienna Convention. *See id.* (Convention applies prospectively "[w]ithout prejudice to the application of any rules set forth in the present Convention to which treaties would be subject under international law independently of the Convention.").

*Trans World Airlines, Inc.,* 528 F.2d 31, 36 (2d Cir.1975) (Warsaw Convention), ... as has the United States Department of State."), *rev'd on other grounds sub nom., Sale v. Haitian Ctrs.,* 509 U.S. 155, 113 S.Ct. 2549, 125 L.Ed.2d 128 (1993). In addition, the Restatement relies on the Vienna Convention as a codification of the customary international law of treaties, *see* Restatement Introduction ("[C]odification of branches of international law by international bodies ... have provided authoritative text as a source for restatement of some topics. This is the case, for example, with respect to the international law of treaties, largely codified in the Vienna Convention on the Law of Treaties."), and confirms that "[t]he international law restated here ... represents ... the rules that an impartial tribunal would apply if charged with deciding a controversy in accordance with international law," *id.*

■ We therefore treat the Vienna Convention as an authoritative guide to the customary international law of treaties. Although a number of the Vienna Convention's provisions reflected "progressive development of international law" when the treaty was opened for signature in 1969, the parties do not dispute that the articles directly implicated in this case reflect customary international law as it was in 1967 when South Korea adhered to the Hague Protocol. Rather, the parties dispute the interpretation and application of these articles.

C. *The United States and South Korea Are Not in a Treaty Relationship Pursuant to the Original Warsaw Convention*

Article 40(5) of the Vienna Convention concerns the effect of becoming a party to a treaty after an amending agreement has entered into force:

5. Any State which becomes a party to the treaty after the entry into force of the amending agreement shall, failing an expression of a different intention by that State:

(a) be considered as a party to the treaty as amended; and

(b) be considered as a party to the unamended treaty in relation to any party to the treaty not bound by the amending agreement.

Vienna Convention, *supra,* art. 40(5), 1155 U.N.T.S. at 342.

Chubb argues that South Korea "bec[ame] a party to the treaty" by adhering to the Hague Protocol. By operation of Article 40(5)(b) then, South Korea would be considered a party to the unamended treaty in relation to any party to the treaty not bound by the amending agreement, in this case, the United States. *See* Dr. Rene H. Mankiewicz, The Liability Regime of the International Air Carrier 2 (1981) ("[T]he original Convention applies not only to carriage between countries parties to it, but also to carriage between a State that has ratified the Hague Protocol and a State that is a party only to the original Convention. It is immaterial whether the former State had previously ratified the original Convention...."). The language of Article 40(5) is ambiguous, however, as to the meaning of "becomes a party to the treaty." It is unclear whether a State may "become[ ] a party to the treaty" simply by adhering to the amending agreement or whether a State must adhere to the original treaty to "become[ ] a party to the treaty.". *Compare id. with* Frankowska, *supra,* at 364–65 (arguing that Article 40(5)(b) applies only when a State adheres to the original treaty after it has been amended by fewer than all of the parties to the original treaty and does not apply when a State adheres to the treaty as amended because "[t]he drafters of article 40 did not contemplate such a situation, nor did the Vienna Convention commentators").

■ Asiana argues that this Court need not determine the meaning of "becomes a party to the treaty" because South Korea expressed a "different intention" when it

adhered to the Hague Protocol. We agree with Asiana that the parties to the Hague Protocol expressed an intention not to be bound to the Original Warsaw Convention. The Hague Protocol created a new treaty: "As between the Parties to this Protocol, the Convention and the Protocol shall be read and interpreted together as *one single instrument* and shall be known as the *Warsaw Convention as amended at The Hague, 1955.*" Hague Protocol, *supra*, art. XIX, 478 U.N.T.S. at 387 (emphasis altered). Those States that adhered to the Hague Protocol specifically adhered to the Warsaw Convention as amended at the Hague, not the Original Warsaw Convention. *See id.* at art. XXIII(2), 478 U.N.T.S. at 387 ("Adherence to this Protocol by any State which is not a Party to the Convention shall have the effect of adherence to the Convention *as amended by this Protocol.*") (emphasis added). Thus, when South Korea adhered to the Hague Protocol, it indicated its intention not to be bound to the Original Warsaw Convention. Although it could have adhered separately to the Original Warsaw Convention, South Korea never exercised that option. South Korea is not therefore in a treaty relationship with the United States pursuant to the Original Warsaw Convention. *See* Treaties in Force, *supra*, at 342 n. 1 ("Korea (Rep.) [is a party] to the convention *as amended;* the United States is *not* a party to the amending protocol."); *cf. Korean Air Lines Disaster*, 664 F.Supp. at 1469 ("[S]ince the Protocol came later than the Convention it essentially offered new nations a choice: adopt the Warsaw Convention as originally formulated in 1929 or adopt the amended version as formulated in 1955.").

D. *The Actions of the United States and South Korea Did Not Create a Treaty Relationship*

■ Relying on the reasoning of *Korean Air Lines Disaster* and *Hyosung*, the court below held that ratification by the United States of the Original Warsaw Convention and adherence by South Korea to the Amended Warsaw Convention created a treaty relationship between the United States and South Korea consisting of the portions of each version of the treaty to which both countries agreed. *See Chubb*, 1998 WL 647185, at *6. We reject the reasoning of these courts because these holdings

bind the parties neither [to] the original unamended Convention, nor to the Convention as amended by the Protocol, but rather to a third, hybrid treaty that does not in fact exist—one consisting of only those items from the original Convention that were not later amended by the Protocol. . . . [T]his a la carte approach . . . effectively negates the agreement by the United States to those portions of the treaty to which Korea did not accede.

*Chubb*, 1998 WL 647185, at *6 (laying out Chubb's argument) (internal quotations and alterations omitted). Because the court below adopted the reasoning of *Korean Air Lines Disaster* and *Hyosung*, we address the reasoning of those cases in detail.

In *Korean Air Lines Disaster*, the defendant Korean Air Lines was carrying passengers between South Korea and the United States. Prior to the flight, Korean Air Lines had signed the Montreal Intercarrier Agreement. The plaintiffs argued that no treaty relationship existed between South Korea and the United States and further argued that

the absence of a treaty relationship prevents the Court from exercising any of the Convention's provisions in favor of Defendant, Korean Air Lines, a corporate citizen of Korea. Instead, Plaintiffs would have the Court "enforce" the Montreal Agreement, as though it were a separate contract, without regard to the Warsaw Convention.

*Korean Air Lines Disaster*, 664 F.Supp. at 1468–69.

The court first stated that the Hague Protocol offered nations a choice to "adopt the Warsaw Convention as originally for-

mulated in 1929 or [to] adopt the amended version as formulated in 1955." *Id.* at 1469. However, instead of either (1) finding that South Korea became a party to the Original Warsaw Convention and applying that treaty, or (2) finding that South Korea became a party to the Amended Warsaw Convention and dismissing the action for lack of subject matter jurisdiction, the court held that it had jurisdiction because the United States and South Korea were parties to the same treaty "*[a]t least* with respect to the unamended portions of the Convention." *Id.* (emphasis added). Having made that holding for purposes of conferring jurisdiction, the court then proceeded to apply Article 3 of the *Original* Warsaw Convention, *see id.* at 1474–75 (quoting original Article 3), despite that Article 3 was substantively amended by the Hague Protocol, *see* International Air Transport Association, *supra,* at 4, and therefore was not an "unamended portion of the Convention."

To the extent that the *Korean Air Lines Disaster* court found the United States in treaty relations with South Korea with respect to the Original Warsaw Convention, we have already rejected that theory of jurisdiction. To the extent the court found the United States in treaty relations with South Korea with respect to the Truncated Warsaw Convention, or in that court's words, "the unamended portions of the Convention," as discussed below, we reject that as well.

In *Hyosung,* the plaintiff hired defendant Japan Air Lines to transport cargo from South Korea to the United States. The cargo was damaged, and the plaintiff sued under the Original Warsaw Convention alleging willful misconduct and negligence in the defendant's handling of the cargo. The defendant moved to dismiss for lack of subject matter jurisdiction, arguing that the dispute did not arise under a treaty of the United States for purposes of 28 U.S.C. § 1331 because no treaty relationship existed between the United States and South Korea with regard to the international carriage of goods by air. *Hyosung,* 624 F.Supp. at 727–28.

The court concluded that "adherence to the Hague Protocol includes adherence to the Convention." *Id.* at 728–29 (citing Article XXIII of the Hague Protocol and *Korean Air Lines Disaster,* 664 F.Supp. at 1469 ("Korea has chosen to adhere to the Hague Protocol and is therefore a High Contracting Party to the Warsaw Convention *through* those amendments.")). According to the court,

> [s]ince each country has adhered to unamended portions, the Convention does provide the substantive law governing air carriage disputes concerning carriers from the Republic of Korea and the United States which are within the scope of these sections. To require Korea to execute the Convention in addition to the Protocol adopting the Convention would be to exalt the formality of treaty signatories over the substance of the two nations' agreement regarding this air carriage contract. Absent a finding that these unamended portions are inseverable from the rest of the treaty because of prejudice to either nation, the unamended sections will be considered a treaty agreement between the United States and Korea.

*Id.* at 729.

Requiring South Korea to execute the Original Warsaw Convention in addition to the Hague Protocol would not, however, "exalt the formality of treaty signatories over the substance of the two nations' agreement regarding" international carriage by air; it would create the agreement between the United States and South Korea. And that agreement would place South Korea in treaty relations with the United States as to the *entire* Original Warsaw Convention, not the Truncated Warsaw Convention fashioned by the court. Even if it could be said that South Korea agreed to be bound by a subset of the Original Warsaw Convention when it adhered to the Hague Protocol, the United States did not agree to be bound by that

same subset of provisions when it ratified the Original Warsaw Convention.

Article 17(1) of the Vienna Convention supports this conclusion that the United States is not in treaty relations with any State that adhered to only a portion of the Original Warsaw Convention. Article 17(1) states that "the consent of a state to be bound by part of a treaty is effective only if the treaty so permits or the other contracting States so agree." Vienna Convention, *supra*, art. 17(1), 1155 U.N.T.S. at 336; Restatement § 312 cmt. f ("A state may consent to be bound by part of an agreement only, if that is permitted by the agreement or if the other contracting states consent."). The Original Warsaw Convention does not provide for partial adherence and the United States has not consented to partial adherence by any State, including South Korea. Under Article 17(1) of the Vienna Convention then, partial adherence by South Korea to the Original Warsaw Convention has no effect vis-a-vis the United States, and did not create treaty relations between the United States and South Korea.

The *Hyosung* court rejected the argument that Article 17(1) dictated that the United States and South Korea were not in treaty relations with regard to a portion of the Original Warsaw Convention, reasoning that Article 17(1) was inapplicable because the issue was "not whether it is proper to allow one state to adhere to a portion of a treaty but whether both states' adherence to portions of a treaty may be deemed to constitute an agreement between those two nations." *Hyosung*, 624 F.Supp. at 729. This reasoning ignores that the United States did not adhere to a portion of a treaty when it ratified the Original Warsaw Convention; it adhered to an entire treaty that encompassed an entire liability scheme.

In short,

there seems to be little, if any, authority for [the *Hyosung* court's] theory in the law of treaties. In fact, a general principle of international law—enunciated by the Permanent Court of International Justice in The Lotus—prohibits any presumption of restrictions on the freedom of States, and thus points in the opposite direction. Unless it can be proven that a State consented to be bound by an international obligation, the presumption that it is not bound prevails.

Frankowska, *supra*, at 365. The court's creation of a Truncated Warsaw Convention simply is not supported by the customary international law of treaties.

■ The creation of a Truncated Warsaw Convention is also a violation of the doctrine of the Separation of Powers. The treaty-making powers are vested in the executive and legislative branches of the United States Government, and not in the judicial branch. *See* U.S. Const. Art. II, § 2, cl. 2 ("[The President] shall have the Power, by and with the Advice and Consent of the Senate, to make Treaties . . . ."). Thus, "to alter, amend, or add to any treaty, by inserting any clause, whether small or great, important or trivial, would be, on our part, an usurpation of power, and not an exercise of judicial functions. It would be to make, and not to construe a treaty." *In re The Amiable Isabella*, 19 U.S. (6 Wheat) 1, 71, 5 L.Ed. 191 (1821). In creating a treaty, the *Hyosung* court and the court below impermissibly encroached on the treaty-making powers of the political branches.

The *Hyosung* court recognized that the executive branch of the United States Government maintained that South Korea was not in treaty relations with the United States with regard to international carriage by air because South Korea had adhered only to the Warsaw Convention as amended by the Hague Protocol. *Hyosung*, 624 F.Supp. at 729 (citing Civil Aeronautics Board, Aeronautical Statutes and Related Material 512 n. 2 (1974) (editor's note) and a letter written by Attorney Advisor on Treaty Affairs for the Department of State). The court, however, felt unconstrained by the Department of

State's authority on the existence of treaty relations, apparently because the Department of State had not considered the reasoning of Article 40 of the Vienna Convention. *See Hyosung,* 624 F.Supp. at 729. The *Hyosung* court's choice to ignore the interpretation of the Department of State based on Article 40 of the Vienna Convention was "astounding under the circumstances." Frankowska, *supra,* at 364. First, the United States is not a party to the Vienna convention. Second, the *Hyosung* court misapplied Article 40 of the Vienna Convention. Third, the opinion of the Department of State on the existence of treaty relations should be taken into account regardless of whether it considered an article of a treaty not in force in the United States.

Put simply, "it is not within the province of the judiciary to alter the *quid pro quo* agreed to by the political branches [in the Original Warsaw Convention.]" *Korean Air Lines Disaster,* 664 F.Supp. at 1475. The Supreme Court has stated that Articles 3, 4, 8, and 9 of the Original Warsaw Convention create substantive limits on Article 22 as part of a quid pro quo scheme of liability. *See Chan v. Korean Air Lines, Ltd.,* 490 U.S. 122, 131, 109 S.Ct. 1676, 104 L.Ed.2d 113 (1989) (on appeal from *Korean Air Lines Disaster,* 829 F.2d 1171).[6] In *Chan,* the Supreme Court addressed the required form of a passenger ticket under the Original Warsaw Convention, as modified by the Montreal Intercarrier Agreement. *Id.* at 125–26, 109 S.Ct. 1676. The focus of the case was whether Article 3 of the Original Warsaw Convention permitted a carrier to retain the benefit of limited liability after delivering a passenger ticket with undersized typeface. *Id.* at 126–28, 109 S.Ct. 1676. In making that determination, the Court compared Article 3 (passenger ticket requirements) with Article 4 (baggage claim check requirements) and Articles 8 and 9 (air waybill requirements). The Court noted that Articles 3, 4, 8, and 9 all

provide ... that if the relevant document (ticket, baggage check or air waybill) has not been delivered (or, in the case of air waybill, "made out"), the carrier "shall not be entitled to avail himself of the provisions of this convention which exclude or limit his liability".... [U]nlike [Article 3, however, the other Articles] specifically impose [that] sanction for failure to include in the documents certain particulars.... ·

*Id.* at 131, 109 S.Ct. 1676. It follows that a court cannot remove the particulars of Articles 4, 8, and 9 without altering fundamentally the character of the Original Warsaw Convention.

A review of the facts of this case illustrates how use of the Truncated Warsaw Convention violates the foregoing principle. The United States adhered tò the Original Warsaw Convention, which, as the Magistrate Judge's Report and Recommendation indicated, would provide no limitation on liability because of Asiana's failure properly to include the particulars on the Waybill. By applying the Truncated Warsaw Convention, however, the district court placed the United States in a treaty that did provide limited liability, despite Asiana's failure to include the particulars. This Truncated Warsaw Convention lacks a provision to which the United States adhered—a fundamental alteration of the Original Warsaw Convention resulting in an entirely different outcome.

Like the Supreme Court, this Court has held that "[t]he Convention represents an entire liability scheme, and was intended to serve as a uniform, international law." *Lockerbie,* 928 F.2d at 1280. "The Convention's arbitrary limitations on liability ... are advantageous to the carrier. But the *quid pro quo* for this one-sided advantage is delivery to the passenger of a ticket [pursuant to Article 3] and baggage check [pursuant to Article 4] which give him notice...." *Lisi v. Alitalia–Linee Aeree Italiane,* 370 F.2d 508, 512–13 (2d Cir.

---

**6.** As noted earlier, the issues discussed herein were not raised or addressed on appeal.

1966), *aff'd*, 390 U.S. 455, 88 S.Ct. 1193, 20 L.Ed.2d 27 (1968). This reasoning applies with equal force to Articles 8 and 9. *See Chan*, 490 U.S. at 131, 109 S.Ct. 1676; *Maritime Ins. Co. Ltd. v. Emery Air Freight Corp.*, 983 F.2d 437, 439 (2d Cir. 1993) (discussing articles 8 and 9); *Tai Ping Ins. Co., Ltd. v. Northwest Airlines, Inc.*, 94 F.3d 29, 33 (2d Cir.1996) (same).

In *Maritime*, this Court addressed the particulars of Article 8 of the Original Warsaw Convention and held that because the waybill was missing the "agreed stopping places" particular specified in Article 8(c), the carrier was not permitted to limit its liability. *See Maritime*, 983 F.2d at 441. The Court stated that this reading of the treaty might not be sensible but the Court was nevertheless constrained by it because "[e]ven if a judicial interpretation is 'sensible,' 'to engraft such an interpretation onto the plain language of [the Warsaw Convention] would require an impermissible judicial amendment of the Convention.'" *Id.* at 440 (quoting *Victoria Sales Corp. v. Emery Air Freight, Inc.*, 917 F.2d 705, 708 (2d Cir.1990)). In so stating, the Court relied on the reasoning of Justice Story in *In re The Amiable Isabella* that "'to alter, amend, or add to any treaty, by inserting any clause, whether small or great, important or trivial, would be, on our part, an usurpation of power, and not an exercise of judicial functions. *It would be to make, and not to construe a treaty.*'" *Maritime*, 983 F.2d at 440 (quoting *Isabella*, 19 U.S. (6 Wheat) at 71) (emphasis added). In *Tai Ping*, this Court reiterated the importance of maintaining the quid pro quo of Articles 8, 9 and 22, even though it has become commercially unreasonable:

> We recognize that it appears onerous to deprive Northwest of limited liability protection under Article 9 for its failure to include the agreed stopping places as required by Article 8(c).... The plain language of Article 9 does not make the loss of limited liability protection contingent on prejudice to the shipper or con-

signee.... Although this may seem commercially unreasonable today, "to engraft such an interpretation onto the plain language of [Article 9] would require an impermissible judicial amendment of the Convention."

*Tai Ping* 94 F.3d at 33–34 (quoting *Victoria Sales*, 917 F.2d at 708).

In sum, no precedent in international law allows the creation of a separate treaty based on separate adherence by two States to two different versions of a treaty, and it is not for the judiciary to alter, amend, or create an agreement between the United States and other States. The Original Warsaw Convention created a liability scheme including quid pro quo provisions that cannot be severed without substantially changing the very scheme to which the political branches of the United States agreed. Rewriting the Original Warsaw Convention to omit the "agreed stopping places" requirement impermissibly encroaches upon the treaty-making power reserved to the political branches.

## III.  CONCLUSION

For the foregoing reasons, we hold that the actions of the United States and South Korea did not create treaty relations with regard to the international carriage of goods by air and the court below erred in concluding otherwise. Because we find that the United States and South Korea are not in treaty relations with regard to the international carriage of goods by air, this dispute does not arise under a treaty of the United States and the district court is thereby deprived of subject matter jurisdiction. The judgment of the district court is therefore reversed, and the case is remanded for further proceedings to determine whether there exists some other ground for subject matter jurisdiction.